716 S.E.2d 446

**Mildred H. SHATTO, Employee/Claimant, Respondent,**

v.

**McLEOD REGIONAL MEDICAL CENTER and Key Risk Management Services, Inc., Employer/Carrier, Appellants,**

and

**Staff Care, Inc., and Travelers Insurance, Employer/Carrier, Respondents.**

**No. 4865.**

Court of Appeals of South Carolina.

Submitted March 1, 2011.
Decided Aug. 10, 2011.
Rehearing Denied Sept. 22, 2011.

554

Walter H. Barefoot and Carmelo B. Sammataro, of Columbia, for Appellants.

Blake A. Hewitt and Margaret Miles Bluestein, of Columbia, for Respondent Mildred H. Shatto; Candace G. Hindersman, Richard B. Kale, and Michael W. Burkett, all of Columbia, for Respondent Staff Care.

WILLIAMS, J.

On appeal, McLeod Regional Medical Center (McLeod) argues the Appellate Panel of the Workers' Compensation Commission (Appellate Panel) erred in concluding (1) Mildred H. Shatto (Shatto) was an employee of McLeod and (2) Shatto's fall was compensable and not idiopathic in nature. We reverse and remand.[1]

## FACTS

On March 26, 2007, Staff Care, Inc. (Staff Care), a temporary medical service staffing company located in Irving, Texas, entered into an agreement (the Staffing Agreement) to provide temporary medical services for McLeod Physician Associates.[2] Pursuant to the Staffing Agreement, Staff Care acted as a placement agent for McLeod and was required to use its best efforts in identifying temporary health care professionals acceptable to McLeod. In addition, the Staffing Agreement required Staff Care to verify the health care providers' medical licenses, arrange and complete travel and housing accommodations, provide malpractice insurance, and pay health care providers on behalf of McLeod.

Shatto, a certified registered nurse anesthetist (CRNA), contacted Staff Care after finding a posting on the internet. Shatto was unaware that Staff Care was going to assign her to McLeod. Shatto sent Staff Care her resume, copies of her licenses and medical certifications, her health record, and references. On October 10, 2007, Shatto entered into a Provider Services Agreement (the Provider Agreement), which specifically indicated Shatto was an independent contractor with Staff Care. The next day, Shatto signed an independent contractor declaration form, stating Staff Care "does not have the right to direct or control the manner in which I practice my profession." Additionally, the independent contractor declaration form provided that Shatto was not an employee of

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

2. McLeod Physician Associates is listed as the Client in the Staffing Agreement. For ease of reference, we refer to McLeod Physician Associates and McLeod Regional Medical Center as McLeod throughout this opinion.

Staff Care; Shatto was responsible for paying local, state, and federal taxes; and Shatto was not entitled to unemployment and workers' compensation benefits from Staff Care. On October 24, 2007, Staff Care sent Shatto a confirmation letter regarding her assignment to provide temporary medical services as a CRNA for McLeod from November 2007 to February 2008. The letter also indicated Staff Care agreed to pay an hourly rate of $95 and a $25 per diem. Additionally, Shatto chose which shift she wanted to work while at McLeod.

On the first day of her assignment, Shatto reported to Keith Torgerson, the chief CRNA of McLeod, and received an orientation of the layout of the operating and supply room. During her assignment, Shatto underwent a McLeod employee drug screening and employee health assessment, received an identification badge, and signed several forms, including McLeod's health employee validation form, dress code, parking, and corporate integrity program policies. Shatto acknowledged she received a copy of her job description and completed a temporary employee emergency information sheet, a medical history form, and a mandatory Occupational Safety and Health Administration Respirator Medical Evaluation Form. McLeod also furnished Shatto with scrub suits, disposable paper hats, paper booties, anesthesia machines, monitoring equipment, blood pressure cuffs, pulse oximeters, a stethoscope, drape clamps, laryngoscopes, and blades.

On December 21, 2007, Shatto fell on the operating room floor while assisting in the anesthetization of a patient. She did not recall tripping over any items but believed she tripped over either the bed cords or an I.V. pole. Shatto was treated in McLeod's emergency room and diagnosed with a contusion to the right eye. At the end of December 2007, Shatto's assignment with McLeod was terminated.

On April 30, 2008, Shatto filed a Workers' Compensation Commission Form 50 (Employee's Notice of Claim and/or Request for Hearing) against McLeod and Staff Care. Shatto filed an amended Form 50 on June 2, 2008. Shatto's requests for a hearing against McLeod and Staff Care were consolidated, and a hearing was held on August 21, 2008. The Workers' Compensation Commissioner (the Single Commissioner) con-

cluded Shatto was entitled to workers' compensation benefits as a result of her fall.

The Single Commissioner found an employer-employee relationship existed between McLeod and Shatto and further held (1) McLeod controlled the details of Shatto's work; (2) McLeod furnished Shatto with equipment; (3) McLeod fired Shatto; (4) McLeod was responsible for paying Shatto; and (5) Shatto sustained an injury by accident while in the course of employment. Additionally, the Single Commissioner concluded Shatto was a "borrowed servant" under the borrowed servant doctrine and found (1) a contract, even if it was implied, existed between Shatto and McLeod; (2) Shatto was contracted to provide specific health care services as a CRNA, and McLeod is a general hospital healthcare provider with nurse anesthetists; and (3) McLeod controlled the details of Shatto's work. McLeod appealed the Single Commissioner's decision, and the Appellate Panel affirmed the Single Commissioner. This appeal followed.[3]

## STANDARD OF REVIEW

■ The existence of an employment relationship is a jurisdictional issue for purposes of workers' compensation benefits and is reviewable under a preponderance of the evidence standard. *Brayboy v. WorkForce*, 383 S.C. 463, 466, 681 S.E.2d 567, 568 (2009).

## LAW/ANALYSIS

■ Under settled law, the determination of whether a claimant is an employee or independent contractor focuses on the issue of control, specifically, whether the purported employer had the right to control the claimant in the performance of his or her work. *Wilkinson ex. rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 299, 676 S.E.2d 700, 702 (2009). In evaluating the right of control, the court examines four factors that serve as a means of analyzing the work relationship as a whole: (1) "direct evidence of the right

---

3. Pursuant to a statutory modification of section 42–17–60 of the South Carolina Code (2010), injuries occurring on or after July 1, 2007, are appealed directly to this court.

or exercise of control"; (2) "furnishing of equipment"; (3) "method of payment"; and (4) "right to fire." [4] *Id.*

## A. EMPLOYER–EMPLOYEE RELATIONSHIP

■ At the outset, McLeod contends Shatto's employment did not create an employer-employee relationship because the only contract of employment in this case was the Provider Agreement between Staff Care and Shatto.

■ Despite McLeod's argument, we find the existence of an employer-employee relationship is not conclusively based on the existence of a contract of employment. *See Spivey v. D.G. Constr. Co.*, 321 S.C. 19, 22, 467 S.E.2d 117, 119 (Ct.App. 1996) ("[An employment] contract may be oral or written, and also may be implied from the conduct of the parties. It is enough if the circumstances show unequivocally that the parties recognize the relationship."). Because the crucial question is the right to control, we find the dispositive question is whether the four-factor test from *Wilkinson* is satisfied.

### 1. Direct evidence of the right or exercise of control

■ In deciding whether McLeod had the right to exercise direct control over Shatto, the Appellate Panel found (1) Shatto did not have control over which patients she would anesthetize or the order in which she would anesthetize patients because she received her assignments from her supervisor; (2) Shatto was required to report to Torgerson or the head CRNA on duty; (3) Torgerson had to sign Shatto's time sheet before she submitted it to Staff Care; (4) Shatto had to

---

4. In analyzing the right to control factors, the Appellate Panel's decision cited to *Dawkins v. Jordan*, and noted that "any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation; while, in the opposite direction, contrary evidence is as to any one factor at best only mildly persuasive evidence of contractorship, and sometimes is of almost no such force at all." 341 S.C. 434, 439, 534 S.E.2d 700, 703 (2000). This proposition was expressly overruled by our supreme court in *Wilkinson*. The *Wilkinson* court stated, "We overrule *Dawkins'* analytical framework, for it most assuredly skews the analysis to a finding of employment. We return to our jurisprudence that evaluates the four factors with equal force in both directions." *Wilkinson*, 382 S.C. at 300, 676 S.E.2d at 702 (footnote omitted). Therefore, in determining whether Shatto was an employee of McLeod, we apply the standard enunciated in *Wilkinson*.

administer anesthesia and manage patients after surgery per McLeod's standards; (5) Shatto provided instruction and education to McLeod's student nurse anesthetists; (6) Shatto was required to attend at least 50% of departmental and information meetings; (7) Shatto was required to begin work at 9:00 a.m.; and (8) Shatto was required to sign a statement acknowledging that she understood her job description at McLeod and would comply with McLeod's dress code, corporate integrity program, confidentiality, parking, and name tag policies.

McLeod argues the right to control factor does not favor an employment relationship with Shatto because its control over Shatto was mandated by law. Shatto does not dispute that McLeod was required by law to give Shatto a job description, conduct a drug screening and orientation, and provide Shatto with an identification badge. Nevertheless, Shatto contends McLeod's control over Shatto exceeded the amount required by law because Shatto provided instructions to student nurse anesthetists, McLeod presented Shatto with a dress code, and McLeod had to sign Shatto's time sheets. We find Shatto's argument unpersuasive based on our review of the preponderance of the evidence.

We are aware that hospitals are subject to an array of legal and governmental regulations to ensure proper medical standards for healthcare professionals providing optimal patient care. However, because McLeod's control over Shatto was, in substantial part, derived by law, we find the right to control factor does not favor an employer-employee relationship based on the preponderance of the evidence in the record. *See Wilkinson*, 382 S.C. at 302, 676 S.E.2d at 703 (noting that requiring a worker to comply with the law is not evidence of control by the putative employer).

First, we find Shatto was required to comply with McLeod's anesthesia standards during her assignment. *See* S.C.Code Ann. § 40–33–20(20) (2011) (stating a CRNA shall practice pursuant to approved written guidelines within the facility where practice privileges have been granted). McLeod was also legally required to provide Shatto with a job description and an identification badge. *See* S.C.Code Ann. § 40–33–34(H)(2)(b)(ii) (2011) (stating a CRNA must be provided a

copy of the job description); *see also* S.C.Code Ann. § 44–7–3430 (Supp.2010) (stating all clinical staff, clinical trainees, medical students, interns, and resident physicians of a hospital shall wear badges clearly stating their names, their department, and their job or trainee title).

Moreover, McLeod was required to provide Shatto with an orientation and to ascertain Shatto's health history and health status, as well as her educational and training background pursuant to the Minimum Standards for Licensing Hospitals and Institutional General Infirmaries regulations under the South Carolina Code of Regulations. *See* 24A S.C.Code Ann. Regs. 61–16 § 204(A) (1976) (stating applications for employment at a hospital or institutional general infirmaries shall contain age, education, training, experience, health, and personal background of each employee); 24A S.C.Code Ann. Regs. 61–16 § 204(B) (Supp.2010) (stating all new employees and volunteers who have contact with patients shall have a physical examination within one year prior to employment including a tuberculin skin test no more than three months prior to employment, unless a previously positive reaction can be documented); 24A S.C.Code Ann. Regs. 61–16 § 204(C) (1976) (stating all new personnel shall be oriented to acquaint them with the organization and environment of the facility, their own specific duties and responsibilities, patients' needs, and the emergency/disaster plans of the facility).

Furthermore, even though Torgerson, McLeod's chief CRNA, signed Shatto's time sheets, Staff Care required a McLeod representative's signature on the provider invoices for payment and malpractice documentation. Shatto testified she was told to take the provider invoice to Torgerson. Specifically, in a November 13, 2007 letter to Shatto, Staff Care stated, "[Staff Care] cannot present your Provider Invoice for payment without [the Client Representative] signature." Staff Care's requirement that a McLeod representative sign a provider invoice does not equate to the right of control.

Additionally, we note Shatto was treated differently from McLeod's CRNA employees. In contrast to CRNAs employed by McLeod, Shatto was never "on call" for work and was only permitted to work in the operating room. Torgerson testified McLeod CRNAs are allowed to work in the main

operating room, cardiac area, obstetrics department, the emergency room, radiology suites, and the catheterization lab. Due to safety concerns and the complexity of different medical environments at McLeod, Torgerson testified contract workers like Shatto were prohibited from working in these areas. Accordingly, we find McLeod did not have the right to control Shatto.

## 2. Furnishing of Equipment

■ McLeod contends it was legally required to provide certain medical equipment to Shatto and, as a result, McLeod asserts the furnishing of equipment factor does not favor an employment relationship with Shatto. We agree.

The Appellate Panel found McLeod furnished Shatto with anesthesia and monitoring equipment, blood-pressure cuffs, pulse oximeters, thermometers, scrub suits, disposable paper hats, and paper booties. Further, the Appellate Panel stated:

> There is no indication in any of the exhibits, deposition, or hearing testimony that [Shatto] was required to bring her own anesthetics, needles, syringes, tourniquets, inhalation anesthetic masks, tubing, rubber gloves, or other instruments required to perform her duties as a nurse anesthetist, as all of these materials were supplied by McLeod.

During the workers' compensation hearing, Shatto indicated she never owned an anesthesia machine, and temporary CRNAs do not bring anesthesia equipment while on assignment. Shatto estimated McLeod's anesthesia equipment weighed approximately five hundred pounds or more. Shatto further testified she was required to wear scrubs in the operating room and that Torgerson informed her that she did not need to bring a stethoscope, clamps for the drape, laryngoscopes, and blades because McLeod had "plenty." According to Torgerson, a CRNA on assignment has never brought anesthesia equipment because the law mandates McLeod is responsible for anesthesia equipment. Torgerson also indicated that individuals are required to wear scrubs prior to entry into the operating room.

We find McLeod's furnishing of equipment does not favor an employment relationship with McLeod. Pursuant to the Staffing Agreement, McLeod was required to supply Shatto with customary equipment and supplies according to her

specialty. Moreover, the regulations governing the minimum standards for hospitals require McLeod to maintain anesthesia equipment in operable condition. *See* 24A S.C.Code Ann. Regs. 61–16 § 901 (1976) ("An institutional structure, its components parts, facilities, and all equipment, such as sterilizers, anesthesia machines ... shall be kept in good repair and operating condition.").

Further, the fact McLeod provided Shatto with sterile clothing prior to entering the operating room is in tandem with the regulatory scheme's emphasis on maintaining a sterile environment in the operating room. *See* 24A S.C.Code Ann. Regs. 61–16 § 606.2 (1976) ("The operating rooms shall be separated from non-sterile areas and shall be located so as not to be used as a passageway between, or subject to contamination from, other parts of the hospital."). Based on the foregoing, we find McLeod did not provide Shatto's equipment for purposes of creating a employer-employee relationship.

### 3. Method of Payment

█ Additionally, McLeod contends the method of payment factor does not favor an employment relationship with Shatto. Particularly, McLeod argues Staff Care (1) directly deposited Shatto's hourly wages; (2) provided Shatto with a per diem, a rental car, and medical malpractice insurance; and (3) paid Shatto overtime wages. McLeod further argues it did not provide Shatto with any employee benefits such as group health insurance, vacation and sick days, or a 401 K retirement plan. We agree.

During the hearing, Shatto testified Staff Care deposited her hourly wages into her account and provided a per diem, malpractice insurance coverage, a rental car, and housing. In regard to McLeod's employee benefits, Shatto acknowledged McLeod did not provide her with group health insurance, vacation and sick days, or a 401K retirement plan. Torgerson testified McLeod employees receive benefits, including vacation time, group health insurance, a 401 K retirement plan, continuing education, and medical malpractice insurance. Further, Torgerson indicated McLeod reimbursed Staff Care for Shatto's lodging during her assignment, rental car expenses, medical malpractice insurance coverage, and Shatto's hourly wages. Ms. Diane Bryant of McLeod's payroll depart-

ment testified a search of McLeod's payroll records did not reveal any payment of wages or earnings directly from McLeod to Shatto.

The Appellate Panel found the method of payment factor favored an employment relationship between McLeod and Shatto and specifically held:

Although McLeod did not directly pay [Shatto], McLeod was ultimately responsible for payment of [Shatto's] salary and expenses per the terms of the [Staffing] Agreement which states [McLeod] shall provide or directly reimburse [Shatto] through [Staff Care] for cost of housing outside [McLeod's] facility, local transportation, en route lodging, en route meals, and reasonable transportation costs to and from [McLeod's] location.

Despite Staff Care paying Shatto's hourly wages and expenses relating to her rental car and lodging, McLeod issued several checks for "contract labor" to Staff Care for payment of Shatto's wages, housing, and rental car expenses. McLeod's payment is consistent with the Staffing Agreement provision which states, "[McLeod] shall provide or directly reimburse [Shatto] through [Staff Care] for cost of housing outside [McLeod's] facility, local transportation, en route lodging, en route meals, and reasonable transportation costs to and from [McLeod's] location." Notwithstanding McLeod's payment to Staff Care for Shatto's services, transportation, and housing expenses, the preponderance of the evidence necessitates our finding that Shatto was not an employee of McLeod.

In reaching this conclusion, we find it particularly noteworthy Shatto did not receive employee benefits. Additionally, Staff Care provided Shatto with a 1099 form indicating her nonemployee compensation of $13,916 from Staff Care. Shatto filed a 2007 1040 Profit or Loss From Business (Sole Proprietorship) Schedule C form and listed her nonemployee compensation income of $13,916, $3,168 for car and truck expenses, and $1,342 for supplies. Shatto expended $94 for continuing education courses, $595 for dues and subscriptions, $50 for a registration fee, $130 for licenses and permits, $192 for uniforms, and traveled 6,532 business miles. Consistent with Shatto's tax filings as a sole proprietor, Shatto indicated she never thought of herself as an employee of Staff Care but

only as an "independent locums looking for a job." As noted above, Shatto submitted a 1099 form, which lends support that she was not an employee of McLeod. *See Wilkinson,* 382 S.C. at 303, 676 S.E.2d at 704 (finding method of payment did not bear any indicia of an employment relationship when claimant was furnished with 1099 tax forms and filed as a sole proprietorship). Based on the foregoing, we conclude the method of payment factor does not favor an employment relationship.

## 4. Right to Fire

■ Pursuant to *Wilkinson,* McLeod argues the right to fire factor tilts in favor of finding Shatto was not an employee of McLeod because the agreement between McLeod and Staff Care only granted McLeod a right to terminate. We agree.

In finding McLeod had the right to fire Shatto, the Appellate Panel stated the following:

McLeod had the right to fire [Shatto] if they did not find her services to be appropriate. According to the [Staffing Agreement], McLeod had 48 hours in which to notify Staff Care of its intention to accept [Shatto's] services.... McLeod ultimately fired [Shatto] on December 28, 2007.[5]

In determining whether McLeod had the right to fire, we find *Wilkinson* provides guidance on this issue. Initially, our supreme court noted in *Wilkinson* that the right to fire factor was the most difficult to evaluate because the parties did not confront this issue. *Wilkinson,* 382 S.C. at 304, 676 S.E.2d at 704. Nonetheless, our supreme court recognized a right to terminate in some form exists in an independent contractor arrangement. *Id.* However, in analyzing the right to fire factor, our supreme court stated, "[t]he critical inquiry is the term 'fire,' for it embraces the employment relationship." *Id.* The court then examined the contractural terms between Wilkinson and Palmetto and concluded Palmetto did not have a right to fire. *Id.* Specifically, the court noted either party could terminate the contract upon thirty days' notice, and the contract stated, "[i]n the event either party commits a material breach of any term of this Agreement ... the other party

---

5. The Appellate Panel finding is based on section B.4 of the Duties of Client section of the Staffing Agreement, which provides that McLeod must notify Staff Care of its intention to accept or not to accept Shatto's services within 48 hours after her presentment to McLeod.

shall have the right to terminate this Agreement immediately and hold the party committing the breach liable for damages." *Id.*

In this case, Torgerson testified Shatto's assignment was terminated because McLeod hired full-time employees, which obviated the need for temporary CRNAs. Shatto admitted Torgerson informed her around the end of November or beginning of December 2007 her services would no longer be needed after the holidays because McLeod hired full-time CRNAs who were slated to start working in the beginning of 2008.

The cancellation section of the Staffing Agreement and the Termination section of the Provider Agreement governed the parties' right of termination. Section C.2 of the cancellation section of the Staffing Agreement provided:

[McLeod] may terminate this AGREEMENT or the services of . . . [Shatto] at any time in writing, subject to the limitations included below in Section D.6,[6] provided once [McLeod] has accepted [Shatto] through verbal or written communication, termination by [McLeod] shall not be effective until 30 days after written notice of termination was received by [Staff Care], [McLeod] will be invoiced, in accordance to the rates agreed upon in the ORDER, for all scheduled time through the effective date of termination. Upon termination, [McLeod] also remains obligated for any and all fees and expenses that are due and owing to [Staff Care] under this AGREEMENT, as well as any other fees, expenses or other charges in connection with services performed by [Shatto] through the effective date of termination.

(emphasis in original)

Section C.3 provided in pertinent part:

If, at any time during the course of this AGREEMENT . . . [McLeod] does not reasonably find the performance of [Shatto] to be appropriate; [McLeod] shall provide written notice of such determination to [Staff Care] and [Staff Care]

---

**6.** Section D.6 provided, "[McLeod] agrees that it will not seek to terminate [Shatto's] placement, nor will it refuse [Shatto's] service, for a discriminatory reason, including [Shatto's] race, sex, national origin, religion, age, disability, marital status, veteran status, or any other protected classification."

shall attempt to replace [Shatto]. **[McLeod] shall be solely responsible for terminating [Shatto] due to [her] poor performance, including, but not limited to intentional or unintentional dereliction of duties, gross negligence, or loss of hospital privileges, as determined by [McLeod] in its sole discretion.** [McLeod] may request that [Staff Care] on [McLeod's] behalf deliver a notice of termination to [Shatto], but under no circumstances shall [Staff Care] have the unilateral right or authority to terminate [Shatto's] assignment.

(emphasis in original).

Section 3.02(a) of the termination section of the Provider Agreement, which Shatto initialed and signed, provided in pertinent part:

Either party may terminate this Agreement and [Shatto] or [McLeod] may terminate an assignment with or without cause by giving at least thirty (30) days prior written notice; provided, however, Staff Care shall not have the right to terminate an assignment for [McLeod] for which [Shatto] is performing services.

Section 3.02(d) of the Provider Agreement stated:

[McLeod], at its sole discretion, will have the right to terminate the services of [Shatto] for any assignment if [McLeod] does not reasonably find the services of [Shatto] to be appropriate; provided, however [McLeod] will be liable to [Shatto] for payment for services performed by [Shatto] prior to termination. [Shatto] will not be entitled to payment for any scheduled services not actually performed by [Shatto] as a result of the termination of an assignment.

Similar to the employer in *Wilkinson,* we hold McLeod did not have a right to fire and the parties' right of termination was controlled by the Staffing and Provider Agreements, respectively.[7] Therefore, we find the "right to fire" factor favors McLeod.

Based on the foregoing analysis, we find Shatto was not an employee of McLeod. Because we find Shatto was not an employee of McLeod, we need not address whether Shatto

---

7. The record does not contain a written notice of McLeod's termination of Shatto as prescribed by the Staffing Agreement and the Provider

was a borrowed servant because McLeod did not control Shatto's work. Moreover, because we find Shatto was not an employee of McLeod, we need not address whether Shatto's fall was idiopathic in nature. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when a decision on a prior issue is dispositive).

## CONCLUSION

Based on the foregoing, we reverse the Appellate Panel's decision that Shatto was an employee of McLeod and remand for further proceedings on the issue of whether Shatto was an employee of Staff Care.

Accordingly, the Appellate Panel's decision is

**REVERSED and REMANDED.**

GEATHERS and LOCKEMY, JJ., concur.

---

Agreement. In *Wilkinson*, the court concluded the contract's language only granted the parties the right to terminate the contract. 382 S.C. at 304, 676 S.E.2d at 704. Therefore, even though there is no written notice in the record, the Staffing Agreement and Provider Agreement provided a right of termination, rather than a right to fire. Additionally, Shatto testified Torgerson informed her around the end of November 2007 that McLeod hired four CRNAs who were scheduled to begin employment in January 2008. Shatto testified Torgerson told her that he had to give her thirty days' notice before termination.