518 S.E.2d 591

**James Morgan FUTCH, Petitioner,**

v.

**McALLISTER TOWING OF GEORGETOWN, INC., Respondent.**

**No. 24976.**

Supreme Court of South Carolina.

Heard Jan. 6, 1999.

Decided July 26, 1999.

Rehearing Denied Sept. 9, 1999.

600

Robert L. Widener and Celeste T. Jones, both of the McNair Law Firm, Columbia, for petitioner.

Marvin D. Infinger and Julie O. Medich, both of Sinkler & Boyd, P.A., of Charleston, for respondent.

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

WALLER, Justice:

James M. Futch (Futch) won a jury verdict, as well as treble damages and attorney's fees, in an action he brought pursuant to the state Payment of Wages Act. Futch lost on appeal when the Court of Appeals reversed the trial judge's denial of McAllister Towing's (Employer's) directed verdict motion. We granted Futch's petition for a writ of certiorari to review the Court of Appeals' decision. We reverse.

## FACTS

The facts of this case are undisputed. Employer, headquartered in New York, employed Futch as a tugboat captain and local manager of its operations at the port in Georgetown. Futch, who was eighty-eight years old when this dispute arose, had begun his life on the water in the early 1920s by running mail and supply boats to South Carolina's coastal islands. He had worked as a tugboat captain in the ports at

Charleston and Georgetown since at least the 1960s. His longevity and expertise had made him a respected, well-known figure among the lowcountry shipping community. In 1981, after Georgetown's only tugboat company stopped operating, Futch personally leased tugboats for six months to keep the city's port open for business until Employer took over the defunct company's operations.

Employer discussed the possibility of retirement with Futch in late 1992. Futch told Employer's representative that he had no plans to retire, shook hands with the representative, and left believing his job would continue indefinitely. Employer, however, informed Futch by a written memorandum in December 1992 that his job would terminate at the end of 1993.

Futch knew that Employer often had debated whether to cease operations in Georgetown. Employer discussed those concerns in a letter to the port's director in January 1993. Believing Employer might cease operations and realizing his job would end in December 1993 in any event, Futch and a long-time co-worker, Norman Assey Jr., began discussing the possibility of starting their own tugboat company. Futch and Assey, without revealing anything to Employer, began taking steps to establish their own company. Assey considered Futch a respected mentor. He testified that he and Futch worked as a "team" to start the new company.

An official of a local steel manufacturer declined to commit his business to Futch's new company, stating in a February 1993 letter addressed only to Futch that he made the decision after giving "a great deal of thought to the discussion we had in my office a while back." Officers of two shipping agencies, including one that handled ninety percent of all ships visiting the port of Georgetown, prepared letters in March 1993 stating they would employ Futch and Assey's new tugboat company. The letters named both Futch and Assey, and Futch met directly with at least one of the shipping officers.

Futch and Assey prepared a business plan and sought a $300,000 loan from a bank in spring 1993. The business plan states the men would compete directly with Employer and intended to set their pricing structure fifteen percent below Employer's rates. A letter from a bank officer addressed to

Futch and Assey indicates he met with both men. Futch and Assey purchased one tugboat, leased another, and obtained insurance on both boats in April 1993. Futch, acting as incorporator, reserved a name for the new company with the South Carolina Secretary of State's office in May 1993. Futch signed an annual registration form for the new company required by the South Carolina State Port Authority in August 1993, listing himself as president and Assey as vice president. Assey approached other workers of Employer to discuss whether they would like to work for the new company.

Futch by all accounts continued to ably perform his duties for Employer while secretly laying the groundwork for the new company. Futch's duties as a tugboat captain for Employer did not include customer development or sales. Futch, with decades of experience, did not develop any new skills or contacts while working for Employer. He had known all the companies and people he approached with his idea for a new company for years, long before Employer ever came to Georgetown.

Employer learned about Futch's plans from a local shipping agency on August 2, 1993. Employer fired Futch the next day and refused to pay him $4,200 in monthly commissions he had earned docking and undocking seven ships during July and August 1993. Futch's new company began operations the day after Employer fired Futch.

Futch brought an action seeking $4,200, plus treble damages and attorney's fees, under the Payment of Wages Act. See S.C.Code Ann. §§ 41-10-10 to -110 (Supp.1998). Employer answered, asserting Futch's disloyalty as a defense, and counterclaimed to recover all wages paid to Futch during the entire period of his disloyalty. Tugboat companies owned by Futch and Employer both were operating in Georgetown when the trial occurred in October 1995.

At trial, Employer argued the trial judge should grant it a directed verdict because Futch clearly had violated his duty of loyalty to Employer, thus forfeiting any right to compensation. The judge denied Employer's motion.

The judge instructed the jury to decide whether Futch had proven that Employer had breached its employment agreement by refusing to pay him. If Employer had breached the

agreement, the jury next had to decide whether Employer had proven it did not have to pay Futch because he had breached his duty of loyalty to Employer. The jury awarded $4,200 to Futch after deliberating sixteen minutes. The judge trebled the damages and awarded attorney's fees and prejudgment interest to Futch, for a total award of about $16,402. Employer appealed.

The Court of Appeals reversed, holding 2–1 that the trial judge should have granted Employer's directed verdict motion. *Futch v. McAllister Towing*, 328 S.C. 312, 491 S.E.2d 577 (Ct.App.1997). We now review that decision.

## ISSUES

1. Did the Court of Appeals err in adopting a bright-line rule that an agent or employee's breach of the duty of loyalty results in the forfeiture of all compensation? [1]

2. Did the Court of Appeals err in reversing the trial judge's denial of Employer's directed verdict motion?

## DISCUSSION

### 1. THE PROPRIETY OF THE BRIGHT-LINE RULE

Futch contends the Court of Appeals erred in adopting a bright-line, general rule "that an agent guilty of disloyalty to his principal forfeits *all* compensation." *Futch*, 328 S.C. at 316, 491 S.E.2d at 579 (emphasis added). He argues an agent forfeits compensation only during a period of disloyalty and, when an agent's compensation is apportioned, the agent ought to get paid for time periods or tasks performed while acting loyally. Futch urges the Court to adopt a particular circum-

---

1. The Court of Appeals and the parties have used the terms "employee" and "agent" interchangeably. Distinguishing between these two types of agency relationships—principal-agent and employer-employee—often is difficult, with the only real difference being one of degree. *See* 2A C.J.S. *Agency* § 16 (1972) (discussing similarities and distinctions between the two relationships); *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 492 n. 10 (Colo.1989) (discussing same). We believe the Court of Appeals and the parties correctly recognize that Futch was an agent of Employer, given his duties as the local manager of Employer's operations. Regardless, the principles outlined below apply with equal force to agents and ordinary employees.

stances or balancing test that examines the nature of the employment relationship, the type of disloyalty, and the benefit received by the employer during the period of disloyalty.

■ Initially, we note the Court of Appeals correctly concluded that today's version of the Payment of Wages Act, like its predecessors, does not prohibit an employer from asserting valid defenses or disputing payment in good faith. This Court has stated, in interpreting a predecessor statute of the present Act,[2] that the Legislature did not intend to prevent employers from asserting valid defenses or counterclaims against employees. *See Cato v. Grendel Cotton Mills*, 132 S.C. 454, 456–61, 129 S.E. 203, 205 (1925) (emphasizing the remedial nature of the statute and the sound public policies underlying it, and refusing to allow employers to ignore the statute by claiming their employees had by contract or custom waived their statutory right to prompt payment of wages) (citing *Wynne v. Seaboard Air Line Railway*, 96 S.C. 1, 79 S.E. 521 (1913)); *accord Rice v. Multimedia, Inc.*, 318 S.C. 95, 99, 456 S.E.2d 381, 383 (1995) (concluding that award of treble damages and attorney's fees under today's Payment of Wages Act is discretionary, and Legislature did not intend to deter employer from asserting valid defenses or disputing payment in good faith).

This Court's precedent establishes that an employee who breaches the common law duty of loyalty to an employer, often described as a "faithless servant," forfeits the right to compensation. *See Schuermann v. American KA–RO Corp.*, 295 S.C. 64, 367 S.E.2d 159 (1988) (employee who was fired for cause due to unspecified breach of duty of loyalty gives employer the right to abandon a non-competition clause in contract and thereby avoid paying employee under that clause); *Berry v. Goodyear Tire & Rubber Co.*, 270 S.C. 489, 242 S.E.2d 551 (1978) (tire salesman who was fired by his employer after nineteen years because he worked for competitor while on sick leave and never provided a physician's statement was disloyal; therefore, he was not entitled to severance pay).

---

2. The statute was Section 3812 of the Civil Code of 1912, one of the predecessors of S.C.Code Ann. § 41–11–180 (1986). The Legislature repealed Section 41–11–180 and related provisions in 1986 when it enacted the current Payment of Wages Act.

This Court also has held that solicitation of an employer's customers is a breach of the duty of loyalty, particularly when combined with other acts or plans aimed at competing with the employer. *See Lowndes Products, Inc. v. Brower,* 259 S.C. 322, 335–39, 191 S.E.2d 761, 767–70 (1972) (key employees who contacted and met with investors and a customer of current employer to lay plans to start a competing textile company, who left their employer without notice, and who leased space and ordered materials to build manufacturing equipment were guilty of disloyalty, and owed damages to employer); *Ocean Forest Co. v. Woodside,* 184 S.C. 428, 442–44, 192 S.E. 413, 420 (1937) (an agent hired to collect a single debt who diverted the money to his own use was guilty of disloyalty to the principal; therefore, he was not entitled to his commission); *accord* Restatement (Second) of Agency, §§ 387 and 393 (1958); 30 C.J.S. *Employer–Employee Relationship* §§ 110–113 (1992); 3 C.J.S. *Agency* §§ 271–287 (1973).

We have not, however, explicitly addressed whether a disloyal agent or employee must forfeit *all* compensation or only the portion earned during a period of disloyalty when compensation is apportioned. Nor have we explicitly rejected a test that examines the particular circumstances of a case to decide whether forfeiture of all compensation is appropriate when an agent or employee breaches the duty of loyalty.[3]

■ In debating these questions, we seek to harmonize two important and occasionally conflicting policies: the employee's duty of loyalty and society's interest in fostering free and vigorous economic competition. *See Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486, 493 (Colo.1989) (discussing the conflict). We agree with the Maryland Court of Appeals that "[f]airness dictates that an employee not be permitted to

---

3. Futch's case, as explained below, is one in which we conclude apportionment is proper. His is not a case in which an agent was hired to do a single task. In those cases, apportionment likely would not be proper and the agent may be required to forfeit all compensation. *See Ocean Forest Co.,* 184 S.C. at 443, 192 S.E. at 420 (mentioning apportionment principle, which was not applicable in that case). We leave for another day the question of whether the balancing principles discussed below apply in a non-apportionment case, such that a disloyal agent may not have to forfeit all compensation.

exploit the trust of his employer so as to obtain an unfair advantage in competing with the employer in a matter concerning the latter's business.... [However,] it is important to the free competition basic to our national development as well as to the individual rights of employees who want to go into business for themselves that their spirit of enterprise be not unduly hampered." *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 568–69 (1978). Thus, while employees may lay plans and take limited steps to begin competing with their employers, employees who go too far risk violating their duty of loyalty. We acknowledge, as others have, that "the line separating mere preparation from active competition may be difficult to discern in some cases." *Jet Courier Service*, 771 P.2d at 493; *Maryland Metals*, 382 A.2d at 569.

We believe the bright-line rule applied by the Court of Appeals fails to account for the conflicting policies at work in a disloyalty case. Accordingly, we reverse the Court of Appeals on this issue and instead adopt the balancing approach described below. Such an approach will protect employers from employees' breach of the duty of loyalty, while ensuring employees are not unduly stymied in their efforts to enter the competitive fray of our nation's free enterprise system.

We find the case of *Jet Courier Service* instructive on the issue of employee disloyalty. In that case, a dissatisfied local manager of an air courier service laid extensive plans to compete with his employer, successfully solicited most of his co-employees to come work for his new company, and successfully solicited five of his employer's customers. The manager allegedly continued to ably perform his duties while arranging to start the new company. The Colorado Supreme Court reversed the lower courts' judgment that the manager had not violated his duty of loyalty, and remanded the case for a new trial.

We conclude that *Jet Courier Service*, drawing upon the Restatement (Second) of Agency, offers a more accurate and complete statement of the general rule than the rule stated by our Court of Appeals. "The general rule is that an employee is not entitled to any compensation for services performed during the period he engaged in activities constituting a breach of his duty of loyalty even though part of those

services may have been properly performed." However, even when an employee breaches the duty of loyalty during some periods, he may "still recover compensation for services properly rendered during periods in which no such breach occurred and for which compensation is apportioned in his employment agreement. Apportioned compensation is that paid to an agent or employee that is allocated to certain periods of time or to the completion of specified items of work." *Jet Courier Service,* 771 P.2d at 499–500.

This principle is the same one espoused in Restatement (Second) of Agency, §§ 456 and 469 (1958) [4] and Restatement (Second) of Trusts, § 243 (1959),[5] which courts have relied upon in disloyalty cases. Other courts have endorsed the apportionment principle in cases involving an agent or employee's breach of the duty of loyalty.[6]

---

**4.** Section 456 states:

> If a principal properly discharges an agent for breach of a contract, or the agent wrongfully renounces the employment, the principal is subject to liability to pay to the agent, with a deduction for the loss caused the principal by the breach of contract:
>
> (a) the agreed compensation for services properly rendered for which the contract is apportioned in the contract, whether or not the agent's breach is wilful and deliberate; and
>
> (b) the value, not exceeding the ratable compensation, of services properly rendered for which the compensation is not apportioned if, but only if, the agent's breach is not wilful and deliberate.

Section 469 states:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

**5.** Section 243 states:

> If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation.

> Comment c directs the court to consider factors such as whether the trustee acted in good faith, whether the breach related to the management of the entire trust or only a part of it, and whether the trustee's services were of value to the trust.

**6.** *See Musico v. Champion Credit Corp.,* 764 F.2d 102, 113 (2d Cir.1985) (noting the trend in New York law is toward the Restatement position of apportioning forfeitures of a disloyal agent's compensation when that compensation is allocated to periods of time or the completion of specified items of work); *Chelsea Industries, Inc. v. Gaffney,* 389 Mass.

 Whether an agent or employee's compensation is apportioned, i.e., allocated to certain periods of time or to the completion of specified items of work, usually is a question for the jury. Whether the agent or employee acted disloyally during a particular apportioned period or task also is a question for the jury in most cases. In deciding whether an agent or employee acted disloyally, the jury must focus upon the particular circumstances of the case. The goal is to avoid the unjust enrichment of either party by examining factors such as the nature of the employment relationship, the nature and extent of the employee's services and the breach of duty, the loss or expense caused to the employer by the breach of duty, and the value to the employer of the services properly rendered by the employee. *See Hartford Elevator, Inc. v. Lauer*, 94 Wis.2d 571, 289 N.W.2d 280, 287 (1980) (refusing to adopt rigid rule requiring forfeiture of all compensation during disloyalty; instead the court must focus upon the particular circumstances of a case); *accord Jet Courier Service*, 771 P.2d at 497 (in deciding whether employee impermissibly solicited his co-employees, consider factors such as the nature of the employment relationship, the impact or potential impact of the employee's actions on the employer's operations, and the benefit received by the employer during the period of disloyalty).

 Solicitation of an employer's customers likely will constitute a violation of the duty of loyalty in almost every case,

---

1, 449 N.E.2d 320, 326–28 (1983) (stating disloyal executives could have been forced to repay only the compensation that was in excess of the worth of their services during the period of disloyalty, but the executives ignored two opportunities to present evidence on the issue); *Bessman v. Bessman*, 214 Kan. 510, 520 P.2d 1210, 1220 (1974) (concluding employer was not required to pay disloyal hotel manager during months he embezzled funds, but was required to pay him during months he did not commit any disloyal acts); *Simulation Systems Technologies, Inc. v. Oldham*, 269 N.J.Super. 107, 634 A.2d 1034, 1037 (1993) (indicating that apportionment principle likely applied under New Jersey law, but concluding employer could not recover damages from disloyal employee because it failed to pinpoint pay periods in which each disloyal act was committed and pay apportioned to that period); *Fidelity Fund, Inc. v. Di Santo*, 347 Pa.Super. 112, 500 A.2d 431, 439–40 (1985) (concluding employer could recover commissions paid to insurance agent who wrote policies for a competitor, but not commissions paid to the agent for properly written policies).

while merely preparing and submitting forms to create a new corporation, for example, likely will be seen as permissible pretermination planning. *See Jet Courier Service*, 771 P.2d at 493; *Auxton Computer Enterprises, Inc. v. Parker*, 174 N.J.Super. 418, 416 A.2d 952, 955 (1980) (employee, while still employed, may make arrangements to go to work for a competitor or establish his own business in competition with his employer, but he may not solicit his employer's customers for his own benefit before he has terminated his employment).

■ The trial judge should instruct the jury that, in identifying apportioned tasks or time periods in which an agent or employee acted disloyally, one period of disloyalty may taint succeeding tasks or time periods. If, for example, the agent or employee's disgruntled attitude following a period of disloyalty is so severe that it results in work that is of little or no value to the employer, the jury may conclude the agent or employee should not be compensated for the succeeding task or time period even though no explicitly disloyal acts occurred during that task or time period.

Similarly, even in cases in which apportionment and partial compensation would otherwise be proper, the jury may find that an agent or employee forfeited the right to all compensation because the agent or employee's unusually egregious or reprehensible conduct pervaded and corrupted the entire relationship. *See Bessman v. Bessman, supra* ("faithlessness must 'permeate' the service to cause a *total* loss of compensation") (emphasis in original); *Roberto v. Brown County Gen. Hosp.*, 59 Ohio App.3d 84, 571 N.E.2d 467, 470 (1989) (concluding that disloyal administrator's embezzlement of hospital funds so pervaded the relationship that hospital was not required to pay him deferred compensation he otherwise would have earned during his period of unfaithfulness); *ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill.App.3d 817, 46 Ill.Dec. 186, 413 N.E.2d 1299, 1314–15 (1980) (favorably citing apportionment principle, but concluding key employees conduct in setting up rival concern, soliciting lower employees, and conspiring against employer was so egregious and pervasive that they forfeited their right to all compensation).

## 2. DIRECTED VERDICT MOTION

■ Futch contends the Court of Appeals erred in reversing the trial judge's denial of Employer's directed verdict motion because he did not use Employer's time or money to perform any disloyal acts, and it is undisputed that he ably performed his duties in docking and undocking ships. Any disloyalty occurred before Futch docked the ships in July and August 1993, which was the period in which Employer refused to pay Futch's commissions. Therefore, Employer is required to pay him, Futch asserts.

■ In deciding motions for a directed verdict or judgment notwithstanding the verdict, the evidence and all reasonable inferences which may be drawn from it must be viewed in the light most favorable to the nonmoving party. If more than one reasonable inference can be drawn from the evidence, the case must be submitted to the jury. *Crossley v. State Farm Mutual Auto. Ins.*, 307 S.C. 354, 415 S.E.2d 393 (1992); *see also Weir v. Citicorp Nat'l Services, Inc.*, 312 S.C. 511, 435 S.E.2d 864 (1993) (illustrating an appellate court must apply the same standard when reviewing the trial judge's decision on such motions).

Under the analysis outlined in Issue 1, we find that Futch's compensation was apportioned because his monthly pay was based on the tonnage of each ship he docked or undocked at the port. The question, then, is whether, viewing the evidence in the light most favorable to Futch, the trial judge erred in denying Employer's directed verdict motion alleging that Futch was disloyal as a matter of law.

The jury, under the approach we endorse today, would have to identify loyal and disloyal periods to determine whether Employer was required to pay Futch the withheld wages.[7]

---

7. A jury also may have to decide whether an employer is entitled to recover any wages paid to an employee during periods of disloyalty. *Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d at 326–28 (indicating disloyal employee may be required to pay back compensation received during periods of disloyalty); *Simulation Systems Technologies, Inc. v. Oldham*, 634 A.2d at 1037 (same); *Fidelity Fund, Inc. v. Di Santo*, 500 A.2d at 439–40 (same). In this case, however, Employer abandoned its counterclaim to recover wages it paid to Futch during alleged periods of disloyalty by failing to present it to the jury. *Cf. Creech v. South Carolina Wildlife and Marine Resources Dep't*, 328 S.C. 24, 491 S.E.2d

The only evidence in the record of any allegedly disloyal act during July and August 1993 was Futch's signing of an annual registration form submitted to the State Port Authority. We believe a jury properly could conclude that act constituted permissible pretermination planning under the particular circumstances of this case. Futch was an apparently vigorous ninety-year-old man at the time of trial. He had "saved" Georgetown's port operations in 1981 by personally leasing tugboats to keep the port open. He had worked hard for decades and wanted to keep working. Employer, the port's only tugboat operator, had talked about leaving town.

Even assuming Futch's earlier solicitations of Employer's customers were disloyal acts, the record contains no evidence that the solicitation tainted Futch's work during July and August. Nor is there any evidence that any purportedly disloyal acts so permeated and corrupted Futch's relationship with Employer that he should forfeit all compensation. Futch continued to perform his job well while making plans to compete with Employer.

■■■ Consequently, we reverse the Court of Appeals and hold that the trial judge properly denied Employer's directed verdict motion. *See Crossley v. State Farm Mutual Auto. Ins., supra.* We reinstate the jury's verdict for Futch of $4,200, the wages Employer refused to pay him. However, we decline to reinstate the award of treble damages and attorney's fees because there was a bona fide dispute about whether Employer owed Futch any wages. The balancing approach we adopt today is a new development in South Carolina employment law, and it would be unfair to penalize Employer because the rules of liability were not fully developed when the case was tried. *See Rice v. Multimedia, Inc.,* 318 S.C. at 98–99, 456 S.E.2d at 383 (imposition of treble damages in cases where there is a bona fide dispute would be unjust and harsh, and Legislature did not intend to deter litigation of reasonable good faith wage disputes); S.C.Code Ann. § 41–10–80(C) (Supp.1998).

---

571 (1997) (issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review).

## CONCLUSION

We reverse the Court of Appeals' application of a bright-line rule requiring a disloyal agent or employee to forfeit all compensation, and adopt instead the balancing approach explained in Issue 1. We reverse the Court of Appeals' holding that the trial judge erred in denying Employer's directed verdict motion. In light of our disposition of the case, it is not necessary to address Futch's remaining issues. *See Whiteside v. Cherokee County School Dist. No. One,* 311 S.C. 335, 428 S.E.2d 886 (1993) (appellate court need not address remaining issues when disposition of prior issue is dispositive).

**REVERSED.**

TOAL, Acting C.J., BURNETT and MOORE, JJ., and Acting Associate Justice GEORGE T. GREGORY, Jr., concur.