728 S.E.2d 24

**Watson William ELDRIDGE IV and Thomas Hadley Eldridge, as Trustees for the Watson William Eldridge, III Revocable Trust, Appellants,**

v.

**Frances Ulmer ELDRIDGE, Individually and Frances Ulmer Eldridge as Trustee for the Frances Ulmer Revocable Trust, Respondents.**

No. 27123.

Supreme Court of South Carolina.

Heard Jan. 11, 2012.

Decided May 9, 2012.

Rehearing Denied July 12, 2012.

114

Kelly McPherson Jolley, of Hilton Head Island, and Robert L. Widener, of McNair Law Firm, of Columbia, for Appellants.

J. Ashley Twombley, of Beaufort, for Respondents.

Chief Justice TOAL.

This case involves a breach of fiduciary duty by a nonparty trustee and whether title to a home located on Hilton Head Island should be transferred to a revocable trust. The circuit court ultimately found that Appellants failed to timely assert their claim to the home. We disagree.

## FACTS/ PROCEDURAL BACKGROUND

William Watson Eldridge III (Father) created two trusts for the ultimate benefit of his sons, William Watson Eldridge IV (Bill) and Thomas Hadley Eldridge (Tom) (collectively, Sons). In 1973, Father formed a revocable trust (R-trust), for which he was the trustee. At the time, the R-trust served primarily for the benefit of Father and his wife (Mother), the principal devolving to Bill and Tom upon their deaths. When Mother died in 1992, Father amended the R-trust to name Bill and Tom as co-successor trustees.

In 1999, Father formed an irrevocable Qualified Personal Residence Trust (QPRT), for which he was trustee, and placed in it a Florida condominium (Florida condo) that he owned. The purpose of creating this trust was to avoid estate taxes upon Father's death since, at the time, his estate was subject to the federal estate tax. Under the terms of the QPRT, Father could sell the Florida condo, but use of the proceeds was limited to the purchase of a replacement home to be placed in the trust, or the purchase of a separate annuity for the benefit of the trust. The trust document named Sons as co-successor trustees of the QPRT. The terms of the QPRT also provided that if Father died within eight years after its formation, the trust assets were to automatically transfer to the R-trust, of which Sons were beneficiaries. If Father was still living eight years after the formation of the QPRT, the trust assets were to be distributed equally among Sons.

Father married Frances Eldridge (Wife) in 2001. Prior to their marriage, Father and Wife entered into a pre-marital agreement to memorialize their intention "to marry for mutual joy," but to keep their estates separate. Wife owned a home in Washington, D.C. and Father owned the Florida condo.

Desiring a "snowbird" home closer to Washington, D.C., they settled on Hilton Head, South Carolina as an ideal middle ground. Acting as trustee of the QPRT trust, Father sold the Florida condo in March 2002 and used the sales proceeds to buy the Hilton Head home. Instead of titling the Hilton Head home in the name of the QPRT trust, as required under the terms of the trust, he titled it in the name of the R–Trust. It is stipulated that this was a breach of Father's fiduciary duty.[1] On April 16, 2003, Father transferred the Hilton Head home from the R-trust to himself and Wife, individually, as joint tenants with the right of survivorship.[2] The parties dispute whether Sons knew about this transfer prior to Father's death. Father died on August 6, 2006, and under the right of survivorship, Wife's sole interest in the Hilton Head home became fully vested. Subsequently, she transferred title in the home to herself as trustee of the Frances Ulmer Eldridge Revocable Trust, of which Wife's children are the beneficiaries at her death.

Had Father not breached his fiduciary duty and placed the Hilton Head home in the QPRT trust, this asset would have

---

1. Prior to selling the Florida condo, Father sent a letter to his attorney reminding him that the purpose of setting up the QPRT in 1999 was to minimize estate taxes, and because recent amendments to the federal estate tax law exempted his estate from the tax, he felt the QPRT trust "superfluous." He informed his attorney that he did not want to put the new residence in the QPRT and asked for his advice on ways to "cancel, or nullify the effects of my 'irrevocable QPER Trust,['] or render it inoperable by reason of superseding Federal Tax law." His attorney responded by letter dated December 10, 2001, informing him that his options were to either put the proceeds from the sale of the Florida condo into a qualified annuity, or to "buy out" the QPRT by paying Sons $78,686.00 with his own cash. Nevertheless, after receiving this letter, Father purchased the Hilton Head home with the Florida condo proceeds and titled it in the name of the R-trust. The parties dispute whether the distribution of *inter vivos* gifts to Sons over a period of years was an attempted "buy out" of the QPRT.

2. A series of letters in the record reflect that a major source of conflict during the early years of Father and Wife's relationship was Wife's insistence that Father title the Hilton Head home in both their names, with right of survivorship. Multiple letters written by Father clearly show his intention that the Hilton Head home ultimately vest with Sons. The couple broke up twice over this issue. The April 16, 2003 transfer was apparently the product of a change of heart by Father. As this case is an adjudication of a breach of trust, the question of Father's intention is not before this Court.

automatically transferred to the R–Trust upon his August 6, 2006 death. On September 28, 2007, Bill and Tom, as trustees of the R-trust, filed suit against Wife and her trust, claiming that the Hilton Head home was held in either a constructive or a resulting trust for the benefit of the R-trust, and requesting the court to transfer the Hilton Head home to the R–Trust. After a bench trial, the master-in-equity (master) issued judgment in favor of Wife. In doing so, the master made the following findings of fact and conclusions of law:

1.  Sons knew of Father's breach of fiduciary duty well before Father died.

2.  Before Father's death, Sons had standing to remedy Father's breach of trust under the R-trust and/or the QPRT trust, and they failed to timely assert their right to do so.

3.  After death, Father's estate was solvent and Sons could have asserted a claim for money damages against Father's estate, rather than Wife's trust, to remedy the breach of trust.

4.  As a matter of law, Sons failed to present evidence necessary to establish a constructive trust.

5.  A resulting trust arose in favor of the R-trust, but any relief was barred by the affirmative defense of laches.

Therefore, the master entered judgment in favor of Wife and her trust, and subsequently denied Sons' motion for reconsideration. This case is now before the Court pursuant to Rule 204(b), SCACR.

## ISSUES

I.  Whether Sons' failure to pursue a legal remedy against Father or Father's estate precludes any action for constructive or resulting trust.

II.  Whether laches bars Sons' action for a resulting trust.

## STANDARD OF REVIEW

In an action at law tried by a master, an appellate court will affirm the master's factual findings if there is any evidence in the record which reasonably supports them. *Estate of Tenney v. S.C. Dep't of Health & Envtl. Control,* 393

S.C. 100, 105, 712 S.E.2d 395, 397 (2011) (citation omitted). In an action at equity, tried by a judge alone, an appellate court may find facts in accordance with its own view of the preponderance of the evidence. *Inlet Harbour v. S.C. Dep't of Parks, Rec. & Tourism*, 377 S.C. 86, 91, 659 S.E.2d 151, 154 (2008). However, the appellate court is not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001). Moreover, the appellant is not relieved of his burden of convincing the appellate court the trial judge committed error in his findings. *Id.* at 387–88, 544 S.E.2d at 623. "Determination of laches rests within the sound discretion of the trial court." *Gibbs v. Kimbrell*, 311 S.C. 261, 269, 428 S.E.2d 725, 730 (Ct.App.1993).

## ANALYSIS

### I.  Adequate Remedy at Law

■ Sons request equitable relief in contending that a constructive or resulting trust has arisen over the Hilton Head home. *See Hayne Fed. Credit Union v. Bailey*, 327 S.C. 242, 248, 489 S.E.2d 472, 475 (1997) ("Equity devised the theory of resulting trust...."); *see also Lollis v. Lollis*, 291 S.C. 525, 530, 354 S.E.2d 559, 561 (1987) ("An action to declare a constructive trust is in equity...."). Generally, equitable relief is only available where there is no adequate remedy at law. *Strategic Res. Co. v. BCS Life Ins. Co.*, 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). The master found that Sons were not entitled to the equitable relief of a resulting or constructive trust because Sons had an adequate remedy at law to cure Father's breach, both before and after Father's death, but failed to timely assert their right to claim damages.[3] We disagree that Sons had an adequate remedy at law.

The master first ruled that Sons, in their status as contingent beneficiaries or co-successor trustees of either the R–Trust or the QPRT, had standing to sue their Father during his lifetime for damages caused by Father's breach of trust

---

3.  Sons argue generally in their Rule 59(e), SCRCP, Motion for Reconsideration, that this was error.

but failed to make a timely claim. We note that any claims made against Father during his lifetime must have been brought on behalf of the QPRT, which by its terms was governed by Florida law. The conclusions reached by the master required a number of assumptions about Florida's law of beneficiary and successor standing and Florida's applicable statute of limitations. As a statute of limitations argument is an affirmative defense, it was Wife's burden to argue the applicable Florida law that might have barred Sons' claim. However, Wife's Answer to Sons Complaint generally avers that "[t]he relief sought in Plaintiffs' Complaint is barred by the Statutes of Limitations." In the absence of Wife meeting her burden, the conclusion that Sons failed to make a timely claim during Father's lifetime was error.

Once Father died, and the house vested fully with Wife, Sons' only legal remedy was to bring action on behalf of the R–Trust against Father's estate. Sons contended at trial they did not sue the estate because the estate did not have enough money to cover the damages. The value of Father's probate estate at the time of death was $54,050. The master disagreed with this contention, holding that under section 62–7–505 of the South Carolina Code, "a property of a trust that was revocable at the time of the settlor's death is subject to claims of the settlor's creditors ... to the extent the settlor's probate estate is inadequate to satisfy those claims...." S.C.Code Ann. § 62–7–505 (Supp.2011). Therefore, for purposes of determining the estate's solvency, the master found that the value of the R-trust could be included, adding $407,897 to the amount of reachable assets. Because Sons brought this action as trustees of the R-trust, the action envisioned by the master—the R-trust suing the estate, but valuing the estate with the assets of the R-trust—would technically result in the R-trust suing itself for damages.

In *Chisolm v. Pryor*, 207 S.C. 54, 60, 35 S.E.2d 21, 24 (1945), this Court elaborated on the adequacy of a legal remedy:

In order to justify a court of equity in refusing to take jurisdiction, the remedy at law must be adequate, and must attain the full end and justice of the case. It is not enough that there is some remedy at law, but that remedy must be as practical, efficient, and prompt as the remedy in equity.

207 S.C. 54, 60, 35 S.E.2d 21, 24 (1945). Because an action for damages against Father's estate would require funds from the R-trust to supplement damages sought by the R-trust itself, we find that the legal remedy would not have been practical. Therefore, this matter should be decided on equitable principles.

## II. Resulting Trust and Laches

The master denied Sons' claim that they were entitled to the Hilton Head home through a constructive trust, but found a resulting trust arose in favor of the R-trust when Father used the proceeds of the QPRT to buy the Hilton Head home.[4] The master denied Sons' prayer for title to the Hilton Head home, however, finding their claim barred by the equitable defense of laches. Neither party disputes the master's finding with regard to the resulting trust and, as such, it is the law of the case. *See, e.g., Richland Cnty. v. Palmetto Cablevision,* 261 S.C. 222, 199 S.E.2d 168 (1973) (stating an unchallenged ruling, right or wrong, is the law of the case). Therefore, the remaining issue before the Court is whether or not the master erred in finding that Sons' claim to the Hilton Head home is barred by laches.

The equitable defense of laches follows the equitable maxim: "Equity aids the vigilant, not those who slumber on their rights." *Hemingway v. Mention,* 228 S.C. 211, 89 S.E.2d 369 (1955). Laches is defined as "neglect for an unreasonable and unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done." *Hallums v. Hallums,* 296 S.C. 195, 198, 371 S.E.2d 525, 527 (1988). "Under the doctrine of laches, if a party, knowing his rights, does not seasonably

---

4. On appeal, Sons dispute the master's finding with regard to the constructive trust, contending that this Court should apply the "trust pursuit rule" to find that the constructive trust that arose when Father took the home out of the QPRT followed the property into the hands of Wife. South Carolina courts have not addressed the trust pursuit rule in the context of innocent third parties. In light of the fact that the master found a resulting trust arose, providing Sons the same remedy, we find it unnecessary to venture into the uncharted territory of the trust pursuit rule. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (appellate court need not address remaining issues when disposition of prior issue is dispositive).

assert them, but by unreasonable delay causes his adversary to incur expenses or enter into obligations or otherwise detrimentally change his position, then equity will ordinarily refuse to enforce those rights." *Chambers of S.C., Inc. v. County Council for Lee Cty.*, 315 S.C. 418, 421, 434 S.E.2d 279, 280 (1993). Thus, the predicate for laches is an unreasonable and unexplained delay.

There is certainly evidence in the record to support the master's finding that Sons knew of Father's breach of fiduciary duty during his lifetime. In fact, Tom admitted at trial that he received a letter dated August 4, 2005, stating:

> My relationship with Frances has been so glorious for my happiness and longevity that I have put the Hilton Head house in our joint names, but still carry it at "cost" on my asset list. Which means that if I die first, she gets the house, but if she dies first, I get it back! Don't make any bets either wway [sic]—we're both 84!

Tom testified that when he confronted Father about the letter, Father got upset with him and stated "he didn't care what anybody said." Seeking to avoid an argument, Tom testified that he "dropped the whole thing and never said anything more about it." Tom further testified that Father told him that he was not going to tell Bill because "Bill would be very upset." This testimony is corroborated by a copy of the August 4, 2005 letter where Tom's name is checked off, but Bill's name is not. Still, the master found that Bill knew Father moved the house out of the QPRT based both on Bill's testimony that he spoke with Father's attorneys about putting the Hilton Head home back in the QPRT and on a billing statement from Father's attorneys showing that a "Bill" called to inquire about adding the Hilton Head home to the QPRT. Bill testified that this line item on the statement referred to Father, who also went by Bill. However, several line items down on this billing statement, there is a description of a call from "Bill, Sr." regarding the estate plan. We uphold the master's finding that Bill knew of Father's breach as early as August 2004, and Tom knew of Father's breach as early as August 2005.

"In general, one with a remainder interest in a trust is not guilty of laches if he sues promptly after his interest vests

in possession, even though there was a long delay before his interest became possessory." *Bonney v. Granger,* 292 S.C. 308, 320, 356 S.E.2d 138, 145 (Ct.App.1987) (citations omitted). Thus, under our jurisprudence Sons were not obligated to sue until after their interest as beneficiaries of the R-trust vested. When Father died in 2006, the QPRT property vested in the R–Trust, and within a year Sons brought action to recover the property. To find this delay was unreasonable would be to stretch the laches doctrine beyond its ordinary bounds. Therefore, the master erred in holding that laches applied to bar Sons' claim for a resulting trust over the Hilton Head home.

## CONCLUSION

We hold that Sons did not have an adequate legal remedy to cure Father's breach of trust, and therefore, disposition of this matter on equitable principles is necessary. It is the law of the case that a resulting trust arose over the Hilton Head home for the benefit of the R–Trust. As Sons filed a claim against Wife and her trust just over a year after Father's death, we hold that laches cannot apply to bar Sons' claim. Accordingly, we reverse and remand with direction that Respondents execute all documents necessary to re-transfer the Hilton Head home to the R–Trust.

**REVERSED AND REMANDED.**

PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.