799 S.E.2d 919

Maxine TAYLOR, Respondent,

v.

HEIRS OF WILLIAM TAYLOR, Heirs of E. Washington, Heirs of Phoebe Taylor, Heirs of Albertha Goodwine, and all persons unknown designated as a class; Richard Roe, and Beaufort County, SC, a body politic, Defendants, of whom Heirs of William Taylor, Heirs of E. Washington, Heirs of Phoebe Taylor, and Heirs of Albertha Goodwine are the Appellants.

Stanley Taylor, Joe A. Taylor and Martha T. Brown, Respondents,

v.

Heirs of William Taylor, Heirs of E. Washington, Heirs of Phoebe Taylor, Heirs of James Joseph Taylor, Heirs of Josephine Taylor and Georgia Champion, Appellants.

Appellate Case No. 2015-000342

Opinion No. 5480

Court of Appeals of South Carolina.

Submitted December 1, 2016

Filed April 26, 2017

Rehearing Denied June 14, 2017

---

640

642

Marc W. Fisher, Jr., of Levin Gilley & Fisher, LLC, of Beaufort, and Amy Kristan Raffaldt, of The Mace Firm, of Myrtle Beach, for Appellants.

George H. O'Kelley, Jr., of O'Kelley Law Firm, of Beaufort, for Respondents.

THOMAS, J.:

This case involves a property dispute between families competing for ownership of a ten acre tract of land in Beaufort County. The master-in-equity granted title for the entire tract to Respondents Maxine Taylor, Stanley Taylor, Joe Taylor, and Martha Brown. Appellants appealed arguing (1) the master erred by finding Respondents were the title owners of the entire tract; (2) they established title to portions of the tract by adverse possession; (3) they were entitled to a presumption of a grant for portions of the tract; and (4) the boundary line was mutually recognized and acquiesced for ten years. We reverse the master's order based on Appellants' adverse possession argument.

## FACTS/PROCEDURAL HISTORY

Respondents initiated this case in June 2011 by filing a complaint seeking to quiet title to lot nine on Warsaw Island in Beaufort County.[1] Respondents asserted they owned all of lot nine through various deeds. Appellants answered and counterclaimed asserting they owned at least a portion of lot nine. Alternatively, Appellants asserted they acquired ownership of a portion of lot nine by adverse possession. This case was referred to the master, and he held the first day of trial in July 2013.

H. G. Judd drafted the earliest plat of this area in the 1800s (Judd Plat). The Judd Plat was a very crude sketch of the lots and did not reveal any subdivisions within the lots. The next earliest map was a tax map from 1954, which was revised in 1965 (1965 Tax Map). The 1965 Tax Map shows Warsaw Road bisecting lot nine with a portion of the lot located north of the road and a portion located south of the road. The 1965 Tax Map also showed lot nine subdivided into parcels five, six, and 6a.[2] According to the 1965 Tax Map, parcel five consists of the Northern Portion and a strip of land along the western side of the Southern Portion. Parcels six and 6a consist of the eastern section of the Southern Portion.

During the first day of trial, David Youmans testified he had been a professional land surveyor for almost thirty years and he researched the property at issue. Youmans asserted his research showed Beaufort County taxed Appellants for parcel five. Youmans testified Beaufort County, at an unknown time, switched the location of the parcels on the tax map and, after the switch, incorrectly showed parcel six consisting of the Northern Portion and parcel five consisting of the Southern Portion. Youmans did not know when this inexplicable switch occurred. However, Youmans testified the switch occurred prior to two tax sales in the late 1990s, which purported to transfer property to Respondents' ancestor, James Taylor.

---

1. Initially, Respondents filed separate cases, but the master consolidated them prior to trial.

2. We refer to the section of lot nine located to the north of Warsaw Road as the Northern Portion and the section of lot nine located to the south of Warsaw Road as the Southern Portion.

Cindy Spencer testified she was a real estate title abstractor and had been researching titles in Beaufort County for twenty-eight years. Spencer testified the tax records for this property went back to 1954 and showed Appellants as owning parcel five as shown on the 1965 Tax Map. Appellants introduced the original property card showing Appellants as the owners of parcel five. Spencer also asserted Appellants had been paying property taxes on parcel five since 1954. Spencer contended the 1954 tax record was the first document to show an owner of parcel five.

Next, Spencer testified she found the two tax sale deeds from the 1990s, which purported to convey the western and eastern portions of parcel six to James. Spencer contended James owned parcel six and 6a following the tax deeds. Spencer testified the tax deeds described parcels six and 6a as bounded on the north by the water, which indicated they were located in the Northern Portion. She testified employees of the treasurer's office write the legal descriptions for properties going to tax sale. Spencer also recognized the parcel switch, as detailed by Youmans, and asserted the property descriptions for the tax sales were based on the switched version of the parcels.

Respondent Martha Brown testified she lived in a mobile home in the Northern Portion at the time of the trial. Martha admitted Georgia Champion, who was one of Appellants, telephoned her after she placed her mobile home in the Northern Portion and claimed the mobile home was on Champion's property. Martha asserted the property where she resided at the time of trial was the property James Taylor, Martha's father, obtained in the tax sale deeds.

Martha testified she grew up in a house on Respondent Maxine's property, which is located on the eastern side of the Southern Portion. Martha acknowledged she socialized with Champion and Champion's sister, Willie Mae Stewart, when they were children and that Champion and Stewart lived north of Warsaw Road.[3]

---

3. Martha's testimony is unclear as to whether she was asserting Champion and Stewart lived in the Northern Portion or on another unrelated property that was north of Warsaw Road.

Respondent Maxine testified she grew up in the house Martha identified as located on the eastern side of the Southern Portion. She admitted she was unaware of her family ever farming or otherwise using the Northern Portion. Maxine claimed she owned the property in the Southern Portion with the house and obtained it in a deed of distribution from James after his death. Maxine testified she believed Respondents owned the entire tract of lot nine.

Appellant Georgia Champion testified she grew up living with her grandparents, Rufus and Mary Taylor, in a house located in the Northern Portion (Rufus House). Champion testified she lived in the Rufus House until she graduated high school in 1972. She asserted Rufus and Mary owned the Rufus House and raised hogs, cows, pigs, and did other farming in the Northern Portion. Champion claimed they had a hog pen in the same area as the mobile home Martha Brown placed in the Northern Portion. Champion testified Rufus died in 1972 and the family began renting the Rufus House. Subsequently, according to Champion, there was a fire at the Rufus House and no one lived there after that. Champion did not testify regarding exactly when the fire occurred. She contended she moved back to the area in 1997 and asked a local fire department to burn down what was left of the Rufus House. Champion claimed she decided to leave the remnants of the Rufus House as a memory for her children and grandchildren. She testified the remnants remain there to this day. Champion asserted there was also a water meter on the Northern Portion, which marked the property as owned by Appellants. Champion testified she had not abandoned the property even though the trees had grown up. She asserted she cleaned up any trash on the property and cut grass and brush during the summer months.

Champion testified she became aware of Martha's plans to place a dwelling on the Northern Portion when Martha began clearing the land. Champion asserted she and other family members went to Martha to inform her Appellants owned that land. Also, Champion testified Appellants had been paying taxes for the Northern Portion "since forever." She asserted Respondents and James never farmed or used any of the property in the Northern Portion.

Willie Mae Stewart testified Georgia Champion was her sister and she was also raised by her grandparents, Rufus and Mary Taylor, in the Rufus House. Stewart asserted she lived in that house from birth in 1956 until 1972 when her grandmother passed away. Stewart testified Appellants farmed in the Northern Portion while she was growing up. She also claimed Appellants farmed in the Southern Portion. Stewart testified there were still stakes, which formed part of Appellants' cow pasture, in the marsh above the Northern Portion. According to Stewart, when her grandmother died and she moved out of the Rufus House, Appellants began renting the house. Stewart asserted the metal roof from the Rufus House was still there at the time of trial despite the fire. Stewart testified Appellants owned property in lot seven [4] as well as in lot nine.

Connie Cooper testified Rufus was her uncle and when she was young she visited them every summer. Cooper claimed the Rufus House was located on lot nine and Appellants farmed the property and raised animals. Cooper testified she and Georgia Champion were approximately the same age. Cooper also testified the remnants of the Rufus House remained, including the metal roof. Cooper's sister, Joan Hillyard, also testified she visited Appellants at the Rufus House on lot nine. Hillyard recalled Appellants farming the land on lot nine and testified the remnants of the Rufus House remained on the property. Isaac Taylor testified Rufus was his father. Isaac claimed the Rufus House was on lot nine and Rufus farmed the land in the Northern Portion. Charles Gardner testified he was related to Rufus as well, and he testified he helped Appellants farm the land and the Rufus House was located on lot nine.

Marjory Kemp testified she was part of the group of Appellants as well and she remembered the Rufus House being on lot nine. Kemp also remembered the fire that damaged it. Kemp asserted she accompanied Georgia Champion to inform Martha Brown her mobile home was on Appellants' property. Kemp contended she handled paying the taxes on

---

4. Lot seven was the subject of a prior quiet title action that resulted in a deed awarding title to Appellants for lot seven. Lot seven is located on lot nine's western border.

the Northern Portion for Appellants. She testified regarding a property record card showing Appellants as the owners of parcel five consisting of six acres. One of the records has a notation to "take house off for 1985 taxes."

Thomas Brown testified his family owned property close to lot nine and he grew up socializing with Champion, Stewart, Maxine, and Martha. Brown asserted he lived in that area until he graduated high school in 1966. Brown claimed Appellants farmed and raised animals in the Northern Portion and James and Respondents farmed in the Southern Portion near James's house.

After Brown's testimony, both parties rested their case. However, the master decided to leave the record open for additional evidence regarding how the parcels became switched in the tax records and the location of the Rufus House.

In April 2014, the master held a second day of trial. Justine Standifer [5] testified she had been a real property transfer clerk in the Beaufort County Assessor's Office for over thirty years. Standifer asserted she researched parcels five and six and determined their locations were switched "one for each other" at some unknown time. She explained parcel five originally was located in the Northern Portion with a small area of parcel five located in the Southern Portion and parcel six and 6a were located in the Southern Portion. At an unknown time, the parcels were switched on the tax maps to show parcel six and 6a located in the Northern Portion and parcel five in the Southern Portion. Standifer testified the 1965 Tax Map showed the parcels as they were originally situated. She acknowledged a switch of the parcels' locations on the tax map would not change who actually owned the properties.

Additionally, Standifer testified regarding property record cards from 1954. She testified one property record card showed Appellants as owning parcel five and the other property record card showed Phoebe Taylor, who was an ancestor of Respondents, owning parcel six. Next, Standifer testified regarding an appraisal sheet from 1985 that showed Appellants

5. Standifer also goes by the first name Debbie.

owned parcel five. She explained the assessor's office generated the appraisal sheet to remove the Rufus House from the tax records following the fire.

Barry Rea testified he worked for the Beaufort County Geographical Information Systems Department, which makes maps from aerial photographs. Rea prepared an aerial photograph of the subject area with the parcels overlaid as the tax records showed the parcels at the time of trial. Rea asserted the aerial photograph showed a building located in the Northern Portion, in what the tax records at the time of trial showed as parcel six.

Connie Cooper, who also testified on the first day of trial, asserted she visited the property with the attorneys, Champion, and Respondents between the two trial days. Cooper testified the group found the remnants of the Rufus House within the Northern Portion. Cooper identified several photographs of the Rufus House. Cooper acknowledged the trees and brush had grown up around the remnants since it burned.

Kimberly Chesney testified she worked for the treasurer in Beaufort County. Chesney testified the tax sales at issue in this case occurred in 1995 and 1997. Chesney asserted the notices for the tax sales went to Phoebe Taylor in care of James Taylor and James was the buyer for both sales. Chesney explained the treasurer conducts tax sales but obtains the property descriptions from the assessor. The descriptions for the ensuing deeds also come from the assessor. Chesney testified Phoebe was the delinquent taxpayer for these tax sales and they were for parcel six. Chesney contended if parcels five and six had not been switched on the tax maps and parcel six came up for tax sale, the treasurer would have sold the Southern Portion, rather than the Northern Portion.

The master issued his order in favor of Respondents in February 2015. The master found a 1937 deed granted title to Phoebe Taylor for all of lot nine. He found the 1960 deed granted title to James for the Southern Portion. Upon James's death, title for the Southern Portion passed to Maxine, and she remains sole owner of the Southern Portion. Despite acknowledging Beaufort County mistakenly switched the locations of the parcels on the tax maps and ordering the county to correct the mistake, the master found James obtained title

to the Northern Portion by way of the two tax sales and James's heirs, other than Maxine, obtained title to the Northern Portion when James died. The order acknowledged Appellants' adverse possession claim but determined they presented "[n]o evidence of such" during trial. This appeal followed.

## STANDARD OF REVIEW

The determination of title to real property is legal in nature. Moreover, an adverse possession claim is an action at law. Thus, an action to quiet title to real property, primarily involving the determination of title to real property based on adverse possession, should be characterized as an action at law. Because an adverse possession claim is an action at law, the character of the possession is a question for the jury or fact finder. Therefore, appellate review is limited to a determination of whether any evidence reasonably tends to support the trier of fact's findings.

*Jones v. Leagan*, 384 S.C. 1, 10, 681 S.E.2d 6, 11 (Ct. App. 2009) (per curiam) (citations omitted).

## ANALYSIS

Appellants argue they met all of the elements for an adverse possession claim for the statutory period of ten years for parcel five as it was shown on the 1965 Tax Map. Respondents argue Appellants "offered no convincing evidence" at trial to show adverse possession. Respondents claim Appellants cannot rely on the Rufus House as evidence because "it was destroyed and abandoned for many years, probably before 1972." Respondents assert the adverse possession claim fails because Appellants did not identify the "extent of the claim." Respondents also argue adverse possession requires an intent to dispossess the owner, which Appellants did not have. Respondents assert Appellants failed to show possession for the statutory period because there was a "gap" of twenty-five years between 1972 and 1995. We agree with Appellants and reverse because they presented clear and convincing evidence of adverse possession and Respondents offered no contrary evidence to reasonably support the master's finding.

"The party asserting adverse possession must show continuous, hostile, open, actual, notorious, and exclusive possession for a certain period of time." *Id.* In South Carolina, the

statutory period for adverse possession is ten years. S.C. Code Ann. § 15-67-210 (2005); *Jones*, 384 S.C. at 10, 681 S.E.2d at 11. A party asserting ownership by adverse possession must show he has met the elements by clear and convincing evidence. *Jones*, 384 S.C. at 10–11, 681 S.E.2d at 11.

To claim title by adverse possession, a party must show the extent of his possession even when entering under color of title. *Clark v. Hargrave*, 323 S.C. 84, 87, 473 S.E.2d 474, 476 (Ct. App. 1996) (per curiam). Color of title alone is not evidence of adverse possession, and "it does not follow that adverse possession can be proved by less evidence when the entry is under color of title than when it is not." *Id.* at 87, 473 S.E.2d at 477 (quoting *Butler v. Lindsey*, 293 S.C. 466, 470, 361 S.E.2d 621, 623 (Ct. App. 1987)). However, color of title is evidence of the extent of the claim and should be considered with the other facts in the case. *Woodle v. Tilghman*, 252 S.C. 138, 144–45, 165 S.E.2d 702, 705 (1969) (internal quotation omitted). Color of title need not be a deed; "[i]t is anything which shows the extent of [the] occupant's claim." *Id.* at 145, 165 S.E.2d at 705. "It is by no means necessary that the paper should be in the form of a deed. A bond or even a receipt would be sufficient." *Id.* "The principle purpose of color of title in adverse possession proceedings is not to show actual grant of land or interest therein, but to designate [the] boundary of possessor's claim." *Id.*

For possession to be open and notorious, "the legal owner need not have actual knowledge the claimant is claiming property adversely, [but] the hostile possession should be so notorious that the legal owner by ordinary diligence should have known of it." *Jones*, 384 S.C. at 13–14, 681 S.E.2d at 13. "[A]cts of ownership of open land for purposes of adverse possession need not include actual residency or occupancy." *Id.* at 14, 681 S.E.2d at 13. "Moreover, activities that do not involve the creation of permanent structures on the land can be sufficiently open and notorious as to put the legal owner on notice that his land is being adversely possessed." *Id.*

For possession to be continuous, a party "claiming adverse possession must have personally held the property for ten years." *Id.* at 15, 681 S.E.2d at 14. "Occasional and

temporary use or occupation does not constitute adverse possession. However, the rule requiring continuity of possession does not mean the person in possession must be actually on the land during the whole of the statutory period." *Id.* at 16, 681 S.E.2d at 14 (citation omitted).

To show the possession was hostile, the adverse claimant is required to show only that his possession was actual, exclusive, open, notorious, and without the consent of the title owner. *Knox v. Bogan*, 322 S.C. 64, 70, 472 S.E.2d 43, 47 (Ct. App. 1996). The mistaken belief rule, which requires the possessor to be aware he does not have title and intend to dispossess the true owner, is not applicable in disputes over entire tracts of land. *Id.*; *see also Perry v. Heirs at Law & Distributees of Gadsden*, 316 S.C. 224, 226, 449 S.E.2d 250, 251 (1994) (per curiam) (finding the mistaken belief rule does not apply in a dispute over an entire tract of land, rather it applies in a boundary line dispute). Thus, for the possession to be hostile when an entire tract of land is at issue, the adverse claimant need not show a conscious intent to dispossess the true owner. *McDaniel v. Kendrick*, 386 S.C. 437, 442–43, 688 S.E.2d 852, 855 (Ct. App. 2009). The claimant may establish hostile possession by showing he occupied the property without the title owner's consent even if he occupied the property under the mistaken belief that it belonged to him. *Id.*

In this case, we reverse the master's finding that Appellants failed to prove the elements of adverse possession because there was no evidence to reasonably support his finding. Appellants established each element of adverse possession by clear and convincing evidence with regard to parcel five as it was shown on the 1965 Tax Map, and Respondents failed to offer any contrary evidence that could have reasonably supported the master's finding.

First, Appellants showed the extent of their claim. Appellants' possession of parcel five was under color of title, which designated the extent of their claim. Appellants testified they believed they owned parcel five, and it was undisputed that Appellants paid the taxes on parcel five going back to 1954. The 1954 property card and the 1985 appraisal sheet showed Appellants owned parcel five. Considering the 1954 property card, the 1965 Tax Map, the 1985 appraisal sheet, the undis-

puted testimony that Appellants paid the taxes for parcel five, and Appellants' avowed belief that they owned parcel five, we find Appellants occupied parcel five under color of title. These documents were evidence of the extent of Appellants' claim, and the 1965 Tax Map showed the boundaries of the land they intended to possess. *See Clark*, 323 S.C. at 87, 473 S.E.2d at 476 ("It is axiomatic that a party claiming title by adverse possession must show the extent of his possession."); *Woodle*, 252 S.C. at 145, 165 S.E.2d at 705 ("The principle purpose of color of title in adverse possession proceedings is not to show actual grant of land or interest therein, but to designate [the] boundary of possessor's claim."). Thus, Appellants identified the extent of their claim, and we disagree with Respondents' contention to the contrary.

Next, clear and convincing evidence showed Appellants met the ten year statutory time period, at a minimum, between 1956 and 1972. The property tax card showed Appellants paid taxes on parcel five beginning no later than 1954. Willie Mae Stewart testified she lived in the Rufus House on parcel five from her birth in 1956 until 1972 when her grandmother passed away. Stewart asserted she and Appellants farmed and raised livestock on parcel five throughout her time living in the Rufus House. Georgia Champion also testified she lived in the Rufus House on parcel five from birth until 1972. Champion echoed Stewart's claim that Appellants farmed and raised livestock on parcel five. Other members of Appellants' family made similar assertions. Significantly, Thomas Brown, an unrelated third party, testified he lived in the area until 1966 and remembered Appellants farming and raising animals on parcel five.

Furthermore, the indisputable evidence confirmed the Rufus House was located on parcel five. The aerial photographs showed the remnants of the Rufus House located within parcel five as it was situated on the 1965 Tax Map. Also, the parties visited the location between the two trial days and confirmed the location of the Rufus House. The foregoing evidence clearly and convincingly showed Appellants were in actual and continuous possession of parcel five from 1956 to 1972, which exceeded the ten year statutory time period.

Additionally, Appellants met their burden of showing possession of parcel five was open and notorious. As discussed above, the evidence showed Appellants lived on parcel five and farmed the property from at least 1956 through 1972. Appellants' acts of living and farming parcel five were sufficient to charge Respondents with knowledge of Appellants' possession of the property. *See Jones*, 384 S.C. at 13–14, 681 S.E.2d at 13 ("[T]he legal owner need not have actual knowledge the claimant is claiming property adversely, [but] the hostile possession should be so notorious that the legal owner by ordinary diligence should have known of it.").

With regard to exclusivity, Appellants' possession of parcel five was exclusive during the statutory period. Respondent Maxine testified she was unaware of Respondents ever farming or otherwise using the Northern Portion. Georgia Champion asserted Respondents never farmed or used any of the property in the Northern Portion. Also, Thomas Brown testified Respondents farmed the land in the Southern Portion near James's house, which was on the eastern side of the Southern Portion and in parcel six or 6a. Thus, Appellants showed by clear and convincing evidence their possession of parcel five was exclusive.

Furthermore, Appellants' possession of parcel five was hostile. As discussed above, Appellants' possession was actual, exclusive, open, and notorious. Appellants' possession was also without Respondents' consent. *See Knox*, 322 S.C. at 70, 472 S.E.2d at 47 (explaining an adverse possessor may carry his burden on hostility by showing his possession was actual, exclusive, open, notorious, and without consent of the title owner). There was no evidence in the record indicating Appellants possessed parcel five with Respondents' permission or consent. Thus, Appellants met their burden with regard to hostility.

Accordingly, after a thorough review of the record, we find there was no evidence reasonably tending to support the master's finding that Appellants presented no evidence of adverse possession. Appellants showed by clear and convincing evidence their possession of parcel five was actual, open, notorious, hostile, exclusive, and continuous between, at a minimum, 1956 and 1972, which satisfied the ten year statuto-

ry period. Appellants established the elements of adverse possession no later than 1972. By establishing the elements of adverse possession as of 1972, Appellants acquired complete and proper title as of 1972 for parcel five as it was shown on the 1965 Tax Map. *See Jones*, 384 S.C. at 19, 681 S.E.2d at 16 (finding a showing of adverse possession of land for the time period prescribed by the statute not only bars the remedy, but practically extinguishes the right of the party having true paper title, and vests a perfect title in the adverse holder (citing *Sumner v. Murphy*, 20 S.C.L. (2 Hill) 488 (1834))); 3 AM. JUR. 2D *Adverse Possession* § 298 (1986) (explaining title acquired by adverse possession is new and independent title by operation of law, is not in privity in any way with any former title and is as effective as a formal conveyance by deed or patent, and such title is "a good, actual, absolute, complete, and perfect legal title in fee simple, carrying all of the remedies attached thereto"); *Jones*, 384 S.C. at 16, 681 S.E.2d at 14 (finding a transfer of possession in 1998 from the adverse possessor to a third party did not defeat the adverse possession claim when it was litigated beginning in 2005 because the ten year statutory period was complete in 1997). Thus, we reverse and find Appellants had title as of 1972 to parcel five as shown on the 1965 Tax Map.

 To the extent Respondents argue Appellants abandoned parcel five and the abandonment defeated the adverse possession claim, we disagree. There was no evidence Appellants abandoned the property between 1956 and 1972. Abandonment in the context of defeating an adverse possession claim refers to abandonment during the statutory period. As noted above, once Appellants met the elements of adverse possession and the statutory period was complete no later than 1972, Appellants acquired perfect title to parcel five. Once Appellants acquired perfect title to parcel five, they could not subsequently lose title by abandonment. However, even if abandonment after the statutory period could defeat the adverse possession claim, Appellants did not abandon parcel five. Appellants testified they continued to pay taxes on parcel five. Appellants claimed they began renting the Rufus House on parcel five in 1972 and continued to rent it until a fire damaged the house. There was no evidence showing when the fire occurred. However, there was further activity with the

property in 1985. Justine Standifer testified regarding a 1985 appraisal sheet that showed Appellants owned parcel five and removed the Rufus House from the tax records, presumably because of the fire. Also, Georgia Champion testified she returned to the area permanently in the late 1990s and employed the local fire department to complete the burning of the house. Champion asserted she continued to cut grass and brush around the property during summer months. Accordingly, to the extent Respondents claim Appellants' adverse possession claim failed because of abandonment, we disagree.

■■■ With regard to the master's finding that section 12-51-160 of the South Carolina Code (2014) prohibited a challenge to the tax sales, we find the master erred. Due to the inexplicable switch of the parcel locations, the true owners of parcel five did not receive notice of the tax sales, and Beaufort County used inaccurate property descriptions. Interestingly, the master found the parcel switch occurred and ordered Beaufort County to correct their records but still found the tax sales, with improper notice and incorrect property descriptions, validly conveyed title for the Northern Portion to James Taylor. Under these circumstances, Appellants could challenge the tax sales in excess of the two year statute of limitations in section 12-51-160. *See King v. James*, 388 S.C. 16, 25, 694 S.E.2d 35, 39 (Ct. App. 2010) (noting counties must conduct tax sales "in strict compliance" with the statute); *Reeping v. JEBBCO, LLC*, 402 S.C. 195, 199, 740 S.E.2d 504, 506 (Ct. App. 2013) ("Failure to give the required notice is a fundamental defect in the tax sale proceedings which renders the proceedings absolutely void." (quoting *Rives v. Bulsa*, 325 S.C. 287, 293, 478 S.E.2d 878, 881 (Ct. App. 1996) (per curiam))); *id.* at 202, 740 S.E.2d at 507 (concluding section 12-51-160 did not preclude a tax sale challenge because a failure to give the owner "proper notice rendered the tax sale void"). Accordingly, we find the master erred by determining Appellants could not challenge the tax sales because more than two years had passed from the date of the tax sales.

Appellants make multiple other arguments regarding alleged errors in the master's order. However, because we reverse the master's finding on adverse possession and find Appellants had title to parcel five, we need not address Appellants' remaining arguments. *See Futch v. McAllister*

*Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (explaining an appellate court need not address remaining issues when disposition of a prior issue is dispositive).

## CONCLUSION

Based on the foregoing, we reverse the master's finding that Appellants' adverse possession claim failed because no evidence reasonably tended to support the finding. We find Appellants met their burden of showing the elements of adverse possession by clear and convincing evidence for parcel five as it was shown on the 1965 Tax Map. Finally, we find Appellants could challenge the tax sales even though more than two years had passed from the date of the sales.

**REVERSED.**[6]

WILLIAMS and GEATHERS, JJ., concur.

---

6. We decide this case without oral argument pursuant to Rule 215, SCACR.