**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
In The Court of Appeals

Jerald D. Gaskins, Jr., Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2019-000907

---

Appeal From Greenville County
Alex Kinlaw, Jr., Circuit Court Judge

---

Unpublished Opinion No. 2025-UP-046
Heard February 13, 2024 – Filed February 5, 2025

---

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

---

Clarence Rauch Wise, of Greenwood, for Petitioner.

Attorney General Alan McCrory Wilson and Senior Assistant Deputy Attorney General Melody Jane Brown, both of Columbia, for Respondent.

---

**MCDONALD, J.:** Jerald D. Gaskins, Jr. (Petitioner) appeals the denial of his application for post-conviction relief (PCR), arguing the circuit court erred in finding he received effective assistance at his trial for criminal sexual conduct (CSC) and lewd act upon a child. Petitioner contends trial counsel was ineffective

in failing to properly object to the State's questioning on multiple points during his cross-examination, inadmissible expert testimony addressing delayed disclosure, and improper vouching by both a police officer and an expert in child abuse pediatrics. We affirm in part, reverse in part, and remand to the circuit court for a new trial.

**Facts and Procedural History**

A Greenville County grand jury indicted Petitioner on four counts of second-degree CSC with a minor and two counts of lewd act upon a child. Petitioner pled not guilty and was convicted on all six counts. The trial court sentenced Petitioner concurrently to twenty years on each of the CSC charges, a concurrent fifteen years on one of the lewd act charges, and a consecutive five years on the remaining lewd act count.

At trial, Victim's mother (Mother) testified that her family met Petitioner and his family in 2011 during a horseshoes tournament. The families then began socializing and grew close. Mother acknowledged that Petitioner had provided financial assistance to the family in the past. Victim, who was thirteen years old when the families met, was often allowed to go to Petitioner's home to visit with his wife and the couple's infant daughter.

Mother recalled that after Victim started spending time with Petitioner's family, she began "back talking," staying in her room, and isolating herself from friends and family; she also stopped attending church on a regular basis. When Victim's phone service expired, Petitioner "offered to put her on his plan." Later, after Mother confiscated Victim's phone because her grades had dropped, Mother found the teenager with a replacement phone provided by Petitioner.

Mother became concerned when Petitioner "started to act a little more controlling towards" Victim. On one such occasion in early October 2012, Father asked Petitioner to bring Victim home after a night of babysitting, but Petitioner "kept coming up with excuses" to avoid bringing Victim home. At this point, Mother told Petitioner "the friendship has run its course" and noted Petitioner "was just being too possessive over her." In November 2012, Mother received a Facebook message from Petitioner's mother-in-law, which led Mother to contact her. After the two women spoke, Petitioner's estranged wife joined the call.

Following this conversation, Mother asked Victim "if there was something going on that she needed to tell me about." Victim initially denied anything untoward

had occurred; however, Victim's sister (Sister) intervened and advised, "There's something you need to tell [M]om.  You need to tell her."  Victim then began crying and said "a few things" about her time with Petitioner, prompting Mother to call the police.

Victim testified that Petitioner approached her sexually after she been spending time with his family hanging out, playing video games, and babysitting the couple's five-month-old daughter.  Victim estimated between ten and twenty sexual encounters occurred at various locations over the course of a year and a half.  Petitioner also testified—he denied ever having sexual or otherwise inappropriate interaction with Victim.  Petitioner discussed his contentious divorce and custody proceeding and claimed Victim's family was retaliating against him for ending his financial assistance to them.  During closing arguments, Petitioner's trial counsel suggested Victim's family acted in concert with Petitioner's wife, from whom Petitioner was estranged, to fabricate lies about Petitioner.

The State also presented the testimony of Victim's friend (Friend) who testified that Petitioner sexually abused her shortly before he approached Victim.  Friend was fourteen when the two sexual encounters with Petitioner occurred, and the details of her abuse were quite similar to the acts described by Victim.

On direct appeal, this court rejected Petitioner's challenge to the admission of Friend's testimony.[1]  We found unpreserved Petitioner's assertion that the trial court erred in allowing the State to cross-examine Petitioner about his purported text messages to Victim's father (Father) and Sister.  *See State v. Gaskins*, Op. No. 2017-UP-166 (S.C. Ct. App. filed Apr. 19, 2017).

Petitioner did not seek further review after this court declined to rehear the matter, but he timely filed this action for post-conviction relief.  The PCR court denied relief and dismissed Petitioner's application with prejudice.  The PCR court also denied Petitioner's motion to alter or amend.

---

[1] At the time of Petitioner's trial and direct appeal, our supreme court had not yet overruled *State v. Wallace*.  *See* 384 S.C. 428, 433, 683 S.E.2d 275, 277-78 (2009), *overruled by State v. Perry*, 430 S.C. 24, 30, 842 S.E.2d 654 (2020) (overruling *Wallace*'s "similarity" test and reiterating that a proper analysis addressing the admissibility of such "bad acts" requires application of the long-standing "logical connection" test seemingly abandoned in *Wallace*).

Petitioner sought certiorari on five issues, and we granted his petition to consider three separate grounds:

1) Whether the PCR court erred in declining to find trial counsel ineffective for failing to object to the State's improper cross-examination of Petitioner;

2) Whether the PCR court erred in declining to find trial counsel ineffective for failing to object to a police officer's delayed disclosure testimony where the officer was not properly qualified as an expert witness; and

3) Whether the PCR court erred in declining to find trial counsel ineffective for failing to object to improper vouching?

**Standard of Review**

"Our standard of review in PCR cases depends on the specific issue before us." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). "In [PCR] proceedings, the burden of proof is on the applicant to prove the allegations in his application." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). "We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Id.* at 180, 810 S.E.2d at 839. "Questions of law are reviewed de novo," and we will reverse when the PCR's decision is controlled by an error of law. *Sellner v. State*, 416 S.C. 606, 610, 787 S.E.2d 525, 527 (2016).

**Analysis**

**I.     The Problems with Petitioner's Cross-Examination**

Petitioner argues the PCR court erred in declining to find his trial counsel ineffective despite his failure to object on multiple grounds during his cross-examination. As to some of his arguments on this point, we agree.

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "In order to establish a claim for ineffective assistance of counsel, the applicant must show that: (1) counsel failed to render reasonably effective assistance under prevailing professional norms, and (2) counsel's deficient performance prejudiced the applicant's case." *Speaks*, 377 S.C. at 399, 660 S.E.2d at 514. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "Counsel's

performance is accorded a favorable presumption, and a reviewing court proceeds from the rebuttable presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Smith v. State*, 386 S.C. 562, 567, 689 S.E.2d 629, 632 (2010) (quoting *Strickland*, 466 U.S. at 690).

"[O]ur courts have held that a cross-examiner must have a good faith factual basis before questioning a witness about his or her past conduct." *State v. McEachern*, 399 S.C. 125, 147, 731 S.E.2d 604, 615 (Ct. App. 2012). "Counsel should not be permitted to go on a fishing expedition, and '[m]erely asking a question that has no basis in fact may be prejudicial.'" *Id.* (quoting *State v. McGuire*, 272 S.C. 547, 550, 253 S.E.2d 103, 104 (1979)).

### A. Facebook Inquiries and Rule 404(b)[2]

At his PCR hearing, an exhibit described as messages between "'Jay Fowler' and a minor child under the age of 16" was introduced. Although the notation, "Jay Fowler – AKA for Gerald [sic] G" appears at the top of this exhibit, the State presented no information either at trial or before the PCR court to explain who made this notation or to otherwise explain how "Jay Fowler" was tied to Petitioner. Yet, during his trial cross-examination, the State asked Petitioner:

> Q. Do you know a lady named [JA]?
>
> A. I know of [JA].
>
> Q. You went to [JA's] house and had dinner with her, didn't you?
>
> A. No. I have not—
>
> Q. October of—
>
> A. I have never been to [JA's] house.

---

[2] Rule 404(b), SCRE, states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent."

Q. October of 2014?

A. No.

Q. Do you know [JA's] daughter, [Daughter]?

A. Not really.

Q. Age 12?

A. Not really.

Q. You sent [Daughter] a Facebook request?

A. Not really?

Q. You not really did?

A. No, ma'am. I'm—what I'm saying is I don't know [Daughter], if she's a Facebook friend or whatever. You can be anybody on Facebook. I don't know.

Q. Did you send her a Facebook request?

A. Not to my knowledge, I did not.

Q. Well, did you—

A. Because I haven't had Facebook in some time.

Q. October of 2014. October 9th of 2014—

A. That would be incorrect. I haven't had Facebook in some time. If you would check it right now, I guarantee you there's nothing on there.

Q. Is that because you started to use the name Jay Fowler now?

A. No. I wouldn't know who Jay Fowler really is. I guess that's someone that's made up, too, I guess.

Q. Yeah, it's like somebody out there is making a lot of stuff up on you?

A. Well, ma'am that is your duty to find that out, isn't it. It's not mine. Because I have no recollection, no knowledge of anything happening—what you're throwing at me.

The State then immediately transitioned into questioning Petitioner about a restraining order and his "active charges." *See infra* Section I.B. At no time during the cited questioning did trial counsel object. Trial counsel failed to object to the State's lack of foundation or the Rule 403 and 404(b) issues implicated by the State's use of the "Jay Fowler" inquiry to suggest Petitioner had approached yet another young girl—this time, a twelve-year-old.

Later, the State again raised the spectre of "Jay Fowler," this time in cross-examining Petitioner about his alleged communications with Friend through Facebook Messenger. Again, the State laid no foundation and did not seek to introduce the messages into evidence. Instead, the State asked Petitioner whether he knew Friend and whether he messaged her:

Q. Okay so [Friend]—you said you don't know [Friend]—

A. I don't know [Friend]. I met her about twice is all I know of her. I never hung out with her.

Q. Y'all didn't sit in the car and—

A. No ma'am.

Q. —talk about music?

A. No. We did not.

Q. Okay. So why did you send her a message on Facebook two weeks ago asking her to call you?

A. I never sent her a message on Facebook asking her to call me. Because I haven't been on Facebook since 2012.

Q. Well, maybe you did it under Jay Fowler?

A. Maybe not. Prove that, ma'am.

Q. So is it your testimony [that] you did not send her a Facebook message—

A. I'm telling you right now, I never sent her a message on Facebook. Because I haven't had Facebook since 2012, since the day I was arrested on November 14, 2012, was—marked the day of my life that was changed forever.

The PCR court's order of dismissal notes Petitioner's allegation that trial counsel failed to object to the State's questioning "regarding text messages or Facebook messages," but does not further address whether trial counsel performed deficiently in failing to object to the State's inquiry regarding Facebook messages Petitioner allegedly sent to Friend nearly two years after his arrest. In his motion to alter or amend, Petitioner again asked the PCR court to make findings regarding the State's cross-examination of Petitioner regarding whether the State improperly alleged he was using the false name "Jay Fowler" on Facebook. Yet again, the PCR court failed to address this issue.

Because the PCR court did not address trial counsel's failure to object to the "Jay Fowler" cross-examination even after Petitioner moved to alter or amend on this specific ground, we are faced with whether or not to remand this matter to the PCR court to set forth appropriate findings. *See* S.C. Code Ann. § 17-27-80 (2014) (stating a PCR court must "make specific findings of fact, and state expressly its conclusions of law, relating to each issue presented"); *Reese v. State*, 425 S.C. 108, 109-11, 820 S.E.2d 376, 377-78 (2018) (citing numerous cases and noting that "[t]his is not the first time this Court has raised concerns over orders . . . that do not comply with section 17-27-80 and Rule 52(a)"); *Smalls*, 422 S.C. at 195, 810 S.E.2d at 847 (observing that "[o]rdinarily," the PCR court rather than the appellate court should make findings of fact).

We decline to remand this matter to the PCR court to set forth these findings because our own review of the record reveals trial counsel's failure to properly object enabled the State to pursue the allegation that he had communicated with another minor female by using a social media alias. Trial counsel's performance regarding the Facebook messaging was deficient, and this "deficient performance prejudiced the applicant's case." *Speaks*, 377 S.C. at 399, 660 S.E.2d at 514.

## B. Restraining Order

Petitioner admitted on cross-examination at trial that he was engaged to be married and that his fiancé was present in the courtroom. The State then inquired:

Q. Isn't there a no-contact order between you and [Fiancé]?

A. There was.

Q. No, there is, isn't there?

A. I'm not sure. It's—

Q. As a condition of your bond, you're not supposed to have any contact with her, isn't that correct?

A. No, it's not correct. It was supposed to have been dissolved.

Q. Sir, you have an active charge with her, correct?

A. Ma'am, once again, it was supposed to be dissolved.

Q. Sir, you have an active charge with her, do you not?

A. I don't know if I do or not, ma'am. But, once again, it was supposed to have been dissolved.

Q. Am I your prosecutor on that case?

A. I don't know if you are or not—

Q. Have you not called me numerous times asking me—

A. No, ma'am, I have not.  No.  There was a letter sent to you, an affidavit filled out for you.

Q. And have you been instructed by our office that that case is not dropped and you are not to have contact with her?

A. Ma'am, I was told it was dismissed.  So I don't know what's going on with it—

Q. Who were you told that by?

A. I guess your office.

Q. No, sir.  No one from my office—

A. Well, then—

Q. —who were you told that by—

A. —I have no idea—

Finally, trial counsel objected—but his only objection was that Petitioner and the solicitor were merely arguing at this point.  And, although the trial court sustained the objection, the State continued:

Q. But you do have an active charge with her?

A. Well, then I'm sorry if I do, ma'am.  But, like I said, once again, I don't know if it was there or not.  Because it wasn't supposed—it was supposed to have been dismissed due to her testimony or her statement.

No further objection followed before the State transitioned to asking Petitioner about his various residences during the time frame of his alleged sexual encounters with Victim.  For the reasons discussed below, trial counsel's failure to object to the State's questioning during this contentious exchange was ineffective, and this deficient performance prejudiced Petitioner.

Whether or not Petitioner's fiancé sought to pursue a criminal charge against Petitioner or obtained a no contact order against him had no relevance to the case being tried, and we see nothing in the record to suggest Petitioner opened the door to this line of questioning. The prejudice resulting from trial counsel's failure to object to the improper reference to an "active charge" stemming from a separate criminal act was compounded by the testy exchange pitting the credibility of the assistant solicitor against the credibility of Petitioner. Nevertheless, the PCR court concluded trial counsel properly objected to the State's accusation that Petitioner violated his fiancé's restraining order, and that there was no deficient performance. This was error.

Trial counsel performed deficiently by failing to promptly object at the outset of the "restraining order" inquiry—and later failed to object to the State's continued inquiry after the trial court sustained his belated objection. We note trial counsel should have objected under Rules 402, 403, and 404(b) to this entire inquiry.[3]

And, again, this deficiency was prejudicial. Although Petitioner's credibility was already questionable, this exchange further communicated the solicitor's belief about Petitioner's lack of credibility when the two argued over whether or not a no-contact order remained in place and an "active charge" was pending. No such discussion should have happened in the presence of the jury.

### C. Text Messages to Father

During Petitioner's cross-examination, the State read aloud and questioned Petitioner about text messages he purportedly sent to Father. Petitioner denied sending the messages and maintained the phone number from which they were sent was not his number. Trial counsel objected on the ground that the State had not laid a proper foundation for the texts, and the trial court initially sustained the objection. The 2013 text asked Father, "[W]ill you drop charges, or are we going to go to court? Either way, I'm still going to hang out with you. Just be honest with me?" After Petitioner denied sending this text, the State asked if he sent Father another text message that read, "Please, my life is . . . f**ked up . . . ." Trial counsel again objected, reiterating his earlier complaint that the State was essentially introducing these text messages by reading them aloud without having

---

[3] Rule 402 addresses relevant versus irrelevant evidence; Rule 403 addresses the exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time; and Rule 404(b) addresses evidence of other crimes or bad acts.

laid the necessary foundation. The trial court again sustained the objection; however, the State requested to be further heard on the matter.

Outside the presence of the jury, the State noted Mother had copies of Father's text messages and could verify that the texts were sent to Father's phone number. The State explained Mother had photographed the texts and claimed the texts had been provided to trial counsel "several weeks, if not months, ago." Trial counsel conceded the State could ask Petitioner if he made such a statement but argued that the State, when questioning Petitioner, was "actually, reading the text messages verbatim." The trial court agreed "it appeared that way," but ultimately ruled the State could ask Petitioner about his alleged texted statements. Trial counsel agreed "she can ask if he makes a statement" but noted "it's almost like you're publishing something to the jury that's not in evidence."

Once the jury returned, the State again asked Petitioner about the texts to Father and referenced specific details from the messages. In response, Petitioner insisted he did not text Father "from 2013 forwards at all" and claimed he cut all ties with Victim's family following his November 2012 arrest.

Father did not testify at Petitioner's trial, but he did appear as a witness at Petitioner's PCR hearing. Although Father admitted he pursued charges against Petitioner for molesting his daughter, he denied receiving these texts from Petitioner. Father claimed he had "not had access to a cell phone since before [he] went to prison" and he "never had Verizon." Father further testified the phone number to which the text messages were sent was not his number and denied knowledge as to whom this phone number belonged.[4]

The PCR court found trial counsel's handling of Father's text messages was reasonable, noting he "objected to questions about the messages twice, the objections were sustained, and counsel further argued against the questions outside of the jury's presence" but the objections were ultimately overruled. The PCR court further stated, "It is unclear from the record what more counsel could have reasonably done to prevent further questions about the messages . . . . [and] it is

---

[4] We note that at trial, the State did not call Mother, Father, a Verizon employee, or any other witness to authenticate the challenged text messages, nor did the State otherwise confirm that the phone number was assigned to or used by Father. Had Father given the same testimony at trial that he gave during the PCR hearing, the trial court likely would have found the State failed to properly authenticate or lay an adequate foundation upon which to cross-examine Petitioner about the texts.

pure conjecture to claim any further objection would have affected the outcome of the trial."

Father's testimony before the PCR court corroborated Petitioner's trial testimony that he did not send the text messages, but it is unclear what more trial counsel could have done at trial. We find it unlikely that the parent of a CSC victim would have cooperated with Petitioner's defense at trial, and it likely would have been dangerous for trial counsel to attempt to call him as a witness solely to address these text messages. Thus, on this point, we find evidence supports the PCR court's finding that trial counsel was not ineffective because he "objected to questions about the messages twice, the objections were sustained, and counsel further argued against the questions outside of the jury's presence" but the objections were ultimately overruled.

### D. Sister's Text Messages

The handling of the copies of text messages provided by Sister to the State on the eve of trial was also problematic. Sister, who was an adult at the time of trial, testified that she received text messages from Petitioner that caused her to suspect an inappropriate relationship between Petitioner and Victim. Trial counsel objected to Sister's testimony, arguing it was hearsay and that, again, the State needed to lay a proper foundation for the text messages. Trial counsel also objected to the late production of the messages.

In camera, Sister testified that she received texts from Petitioner and conversed with him through text messages and voice calls. She claimed she photographed the text messages with her iPad and emailed these photos to the State the day before trial. The trial court overruled trial counsel's objections to Sister's testimony. Before the jury, Sister testified Petitioner sent her both text and verbal messages in which he stated he loved Victim "most of all out of all of us" and noted she took the photos of the text messages with her iPad. When the State later questioned Petitioner about his purported exchange of text messages with Sister, trial counsel failed to object. Petitioner denied messaging with Sister.

The PCR court did not separately address whether trial counsel performed deficiently in failing to object to the State's cross-examination regarding the alleged texting between Petitioner and Sister, and Petitioner did not seek a separate ruling as to these messages in his motion to alter or amend. Thus, as it argued in *Fishburne v. State*, the State argues here that the issues relating to Sister's photographed messages are not preserved for our review. *See* 427 S.C. 505, 517,

832 S.E.2d 584, 590 (2019) (abrogating prior cases in PCR preservation context and remanding "for the issuance of a supplemental order setting forth findings of fact and conclusions of law" on PCR ground not addressed in the original order). In this case, however, because we reverse the order of dismissal on other grounds, we find it unnecessary to remand this matter for a supplemental order.

### E.  Cumulative Error

Petitioner urges this court to address the novel issue of cumulative error in a PCR context, but Petitioner did not raise this argument before the PCR court. Therefore, we find this argument unpreserved.  *See State v. Eubanks*, 437 S.C. 458, 489, 878 S.E.2d 335, 352 (Ct. App. 2022), *cert. denied* (June 20, 2024) (finding cumulative error argument unpreserved where defendant failed to raise it before the circuit court or in his motion for a new trial).

## II.  Petitioner's Remaining Issues

Because we reverse the denial of Petitioner's application due to his trial counsel's ineffective assistance during Petitioner's cross-examination, we decline to address whether the PCR court further erred in addressing (or failing to address) the remaining assignments of error.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting a reviewing court need not address remaining issues when resolution of a prior issue is dispositive).

## Conclusion

When trial counsel was questioned about his strategy, he responded that his theory was that "the whole thing" was a false allegation concocted by Petitioner's wife and Sister to gain advantage during a "nasty divorce."  The messages Mother and Sister provided to the State could to some extent be argued to be part of this alleged concocted scheme.  The same cannot be said for the State's "Jay Fowler" inquiries or its questioning about the unrelated restraining order and charge stemming from Petitioner's treatment of his adult fiancé.  For these reasons, Petitioner suffered prejudice from trial counsel's defective performance on these points.  Accordingly, the PCR court's denial of Gaskins's application for PCR is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**THOMAS, J., and VERDIN, A.J., concur.**