# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Alliance to Preserve the Old White Horse Road Corridor, LLC and Mary Jean Horney, Appellants,

v.

RP&L, LLC and the Greenville County Planning Commission, Respondents.

Appellate Case No. 2022-001301

---

Appeal From Greenville County
G. D. Morgan, Jr., Circuit Court Judge

---

Opinion No. 6144
Heard December 4, 2024 – Filed April 15, 2026

---

**REVERSED**

---

William Marvin Wilson, III, of Wyche Law Firm, and William Franklin Childers, Jr., of Tonnsen Bach Law Firm, both of Greenville, for Appellants.

Townes Boyd Johnson, III, of Townes B. Johnson III, LLC, of Greenville, for Respondent RP&L, LLC.

Andrew F. Lindemann, of Lindemann Law Firm, P.A., of Columbia, for Respondent Greenville County Planning Commission.

---

**MCDONALD, J.:** This appeal arises from the Greenville County Planning Commission's approval of a preliminary subdivision plan for The Stables, a

proposed development of seventy-three homes in northern Greenville County.  The Alliance to Preserve the Old White Horse Road Corridor, LLC (the Alliance) and Mary Jean Horney (collectively, Appellants) contend the Planning Commission erred in approving this development plan because the plan does not comport with Greenville County's Land Development Regulations (2018) (LDR).  More specifically, Appellants assert the Planning Commission (1) failed to set forth findings of fact, conclusions of law, or other written grounds to explain its reasoning for approval of the preliminary subdivision application; (2) approved the application despite a lack of evidence establishing the plan for The Stables satisfies the criteria mandated by the LDR; (3) approved the application despite a lack of evidence that the Greenville County Fire Department had reviewed the plan; and (4) violated Appellants' procedural due process rights by failing to make a revised preliminary plan available for public review prior to the meeting at which the preliminary subdivision application was approved.  We reverse the order of the circuit court affirming the Planning Commission's approval of this proposed development plan.

**Facts and Procedural History**

Horney owns a small horse farm on Old White Horse Road; her farm is adjacent to the proposed location of The Stables subdivision.  Horney organized and incorporated the Alliance in an effort to preserve the area commonly known as "the Old White Horse Road Corridor."

On March 31, 2021, RP&L, LLC filed a preliminary subdivision application with the Greenville County Planning Department, proposing to subdivide and develop approximately forty-three acres of rural agricultural and equestrian land west of the Reedy River at the intersection of Meadow Brook and Old White Horse Roads.[1] RP&L proposed The Stables as a "cluster development"—a development characterized by the clustering of building lots to preserve open space for recreational, environmental, or ecological reasons.  Cluster developments are also called "open space developments."  An open space development "permits housing units to be grouped on sites or lots with dimensions, frontages, and setbacks reduced from conventional sizes" so long as "the density of the tract as a whole shall not exceed the density allowed by the zoning district under existing regulations and the remaining land area is devoted to common open space."

---

[1] Land west of the Reedy River is zoned Residential-Suburban (R-S) and designated "Suburban Edge" under Greenville County's Comprehensive Plan.  This zoning designation allows for up to one dwelling per acre.

The purpose of open space development is to provide a method of land development that permits variation in lot sizes without an increase in the overall density of population or development. This allows the subdivision of land into lots of varying sizes which will provide home buyers a choice of lot sizes according to their needs, while at the same time, preserving open space, tree cover, scenic vistas, natural drainage ways, and outstanding natural topography. Such measures prevent soil erosion and flooding by allowing development to occur according to the nature of the terrain; provide larger open areas with greater utility for rest and recreation; and encourage the development of more attractive and economical site design.

Open space may consist of "developable" and "undevelopable" land as defined in the Zoning Ordinance and/or LDR.

RP&L originally proposed that The Stables include forty-three acres consisting of seventy-three units and 14.05 acres of "open space." While the proposed lots vary in size, most are approximately 7800 square feet or 0.174 acres. Along with its preliminary application, RP&L submitted a preliminary subdivision plan.[2]

After receiving comments from the Subdivision Advisory Committee, Kevin Tumblin of Freeland and Associates, a civil engineer for RP&L, submitted a revised preliminary plan. Ultimately, the request for preliminary plan approval was placed on the agenda for the Planning Commission's May 26, 2021 meeting.

Prior to the meeting, nineteen parties submitted letters opposing the proposed development. Planning Commission staff then prepared a two-page report recommending that the Commission approve the preliminary plan.

At its subsequent meeting, the Planning Commission heard presentations from Appellants' counsel, William Childers, Jr.; another resident of the area aligned with Appellants; and Tumblin, who appeared on behalf of RP&L. Childers argued the

[2] This preliminary plan did not label any areas as developable open space and did not specify proposed uses for the open space as required by LDR Article 11.3.2(B).

preliminary plan for The Stables should be denied because (1) the development was incompatible with the surrounding land use density of the area, and (2) the preliminary plan did not comply with LDR Article 11's open space requirements for cluster developments. Another nearby landowner, Shannon Wilson, also appeared in opposition. Wilson presented a petition with 191 names opposing The Stables and spoke about additional concerns regarding (1) likely traffic increases, (2) storm water management and flooding, (3) the safety of a proposed access to the development, (4) density, and (5) the proposed development's lack of compatibility with the surrounding rural and equestrian area.

During Tumblin's presentation, at least one Planning Commission member raised concerns related to The Stables' proposed access location on Meadow Brook Road, a small, county road with ingress and egress only via the rather heavily-traveled highway known as Old White Horse Road. Commissioner Cindy Clark opined that the proposed access was an "awkward way to get into the subdivision and leave the subdivision." Clark further noted the Fire Department had not commented on the proposed access, stated she had "real concerns" about a fire truck being able to access the proposed subdivision, and commented that she would like to hear from the Fire Department regarding this access concern. Planning Commission staff informed Clark that they had contacted the Fire Department for comment but received no response. Commission staff further noted any approval could be delayed until the Fire Department provided input.

Clark also raised issues about the potential for flooding discussed in correspondence from local resident Don Woodard, who had researched the flooding issues in the area. Clark concluded by stating, "Everything west of the Reedy along this corridor is very rural, large lots. This is not a compatible use along this corridor. And the fact [that The Stables] is sandwiched between 2 equestrian facilities[,] I think is also not a good fit."

Following Commissioner Clark's comments, Commissioner Frank Hammond asked Tumblin if there "is any reason to believe there's a fire safety access issue?" Tumblin responded, "No. After we do improvements to the front entrance and widen it, whatever the county recommends, there won't be any issues."

Commissioner Jay Rogers then asked Tumblin about the distance between The Stables and Green Valley Country Club. As Tumblin was unsure of this distance, Rogers referenced a GIS screen shot presented by Commission staff and stated his own belief that The Stables was not incompatible with the surrounding area

because at least one subdivision near Green Valley contained lots smaller than one acre.[3]

Following these presentations and questions, the Planning Commission approved RP&L's preliminary subdivision application with five votes in favor and four votes opposing. The Planning Commission mailed a letter to RP&L informing it of this approval. Other than the meeting transcript, this letter is the only written record of the decision; the letter does not note the 5-4 vote or include findings supporting the Commission's approval.

Appellants appealed to the circuit court in accordance with section 6-29-1150(D) of the South Carolina Code (2004 & Supp. 2025). Following a hearing, the circuit court affirmed the Planning Commission's approval of the preliminary subdivision application. Appellants timely appealed.

**Standard of Review**

Appellants recognize that the "any evidence" standard of section 6-29-840 of the South Carolina Code (Supp. 2025) requires that "findings of fact by [a zoning] board of appeals must be treated in the same manner as a finding of fact by a jury." However, Appellants contend this standard does not apply because section 6-29-1150—by its plain and unambiguous language—does not require that the findings of fact of a planning commission be treated in the same manner. We disagree, as both *Town of Hollywood v. Floyd*[4] and *Kurschner v. City of Camden Planning Commission*[5] provide for an "any evidence" standard of review. And we

---

[3] The GIS screen shot Rogers referenced shows the location of developments *east* of the Reedy River and not on Old White Horse Road. The land east of the Reedy is zoned Residential-15 (R-15) and characterized as "Suburban Neighborhood" under the County's Comprehensive Plan. That land use designation allows for a significantly greater gross density of 3 to 5 dwellings per acre.

[4] 403 S.C. 466, 476, 744 S.E.2d 161, 166 (2013) ("By statute, the trial court must uphold a decision by the Planning Commission unless there is no evidence to support it.").

[5] 376 S.C. 165, 173-74, 656 S.E.2d 346, 351 (2008) ("We refuse to apply a standard of review different from the any evidence standard in this case, for any other standard of review would be contrary to the legislature's intent in granting a planning commission broad discretion in this area.").

note that in *Grays Hill Baptist Church v. Beaufort County*, our supreme court reiterated that "[i]n the zoning context, a decision of the reviewing body will not be disturbed if there is evidence in the record to support its decision." 431 S.C. 630, 637, 850 S.E.2d 29, 33 (2020). "Instead, 'a decision of a municipal zoning board will be overturned if it is arbitrary, capricious, has no reasonable relation to a lawful purpose, or if the board has abused its discretion.'" *Id.* (quoting *Rest. Row Assocs. v. Horry County*, 335 S.C. 209, 216, 516 S.E.2d 442, 446 (1999)). Nor will a zoning decision be upheld "where it is based on errors of law . . . ." *Id.* (quoting *Hodge v. Pollock*, 223 S.C. 342, 348, 75 S.E.2d 752, 754 (1953)).

**Analysis**

## I. Grounds for Approval and Evidence in Support

Appellants argue the Planning Commission erred in failing to propound any findings of fact, conclusions of law, or other written grounds setting forth its reasoning for approving the preliminary subdivision application for The Stables. We agree that this record lacks the support necessary for us to understand the Planning Commission's approval in light of the evidence before it.

The South Carolina Local Government Comprehensive Planning Enabling Act of 1994[6] (the Enabling Act) gives local governments authority to create planning commissions and implement comprehensive plans to guide land development. The Enabling Act also sets forth certain requirements for these planning entities. *See* S.C. Code Ann. § 6-29-320 (2004) ("The county council of each county may create a county planning commission."); S.C. Code Ann. § 6-29-360 (B) (2004) ("The commission shall adopt rules of organizational procedure and shall keep a record of its resolutions, findings, and determinations, which record must be a public record."); S.C. Code Ann. § 6-29-510(A) (2004) (stating a local planning commission shall develop and maintain a comprehensive plan to guide development in its area of jurisdiction); S.C. Code Ann. § 6-29-1150(B) (2004 & Supp. 2025) ("A record of all actions on all land development plans and subdivision plats with the grounds for approval or disapproval and any conditions attached to the action must be maintained as a public record. In addition, the developer must be notified in writing of the actions taken."). Pursuant to the Enabling Act, Greenville County Council adopted Land Development Regulations with the stated intent to provide for

---

[6] S.C. Code Ann. §§ 6-29-310 to -1640 (2004 & Supp. 2025).

the harmonious development of the county; coordination of streets within subdivisions with other existing or planned streets or with other features of the comprehensive development plan; adequate open spaces for traffic, recreation, light, and air; protection of the floodplain and floodways; and for a distribution of population and traffic which will create conditions favorable to the health, safety, and welfare of the general public.

Greenville County LDR, Article 1.2. In reviewing the applicable statutory requirements, the circuit court reached the "inescapable conclusion . . . that the Commission is not required to issue findings of fact and conclusions of law." The circuit court further found the Commission's "meeting minutes, the transcript of the meeting, and the file material, which includes written opposition to the proposed subdivision, [provide] the record of the Commission's actions and grounds for approval satisfying the requirements of S.C. Code Ann. § 6-29-1150(B)."

Although we do not disagree with the circuit court's ruling that the applicable statutes do not require the Planning Commission to issue a formal written decision setting forth findings of fact and conclusions of law, we are not convinced that the meeting minutes, meeting transcript, and "file material" in this case provide a sufficient record to allow meaningful review of the Commission's 5-4 decision to approve RP&L's preliminary subdivision application. We are unable to discern the grounds for approval as required by section 6-29-1150(B) from the record before us. There is nothing in the record indicating the Planning Commission's reasons for approval, and it is unclear what facts the Planning Commission deemed established. Moreover, we are unable to discern how the Planning Commission applied these "facts" to the LDR and applicable zoning ordinances, nor can we decipher the divided Commission's reasoning from its series of questions and answers. Accordingly, we reverse the circuit court's finding that evidence exists in this record to support the decision of the Planning Commission. *See Grays Hill Baptist Church*, 431 S.C. at 637, 850 S.E.2d at 33 (explaining "the decision of the zoning board will not be upheld where it is based on errors of law . . . ." (quoting *Hodge*, 223 S.C. at 348, 75 S.E.2d at 754)); *id.* (holding "a decision of a municipal zoning board will be overturned if it is arbitrary, capricious, has no reasonable relation to a lawful purpose, or if the board has abused its discretion." (quoting *Rest. Row Assocs.*, 335 S.C. at 216, 516 S.E.2d at 446)).

## II.    LDR Article 3.1

Appellants next argue the Planning Commission erred in approving the preliminary subdivision application for The Stables when there is no evidence establishing the proposed development satisfies all three criteria of LDR Article 3.1.  We agree.

As a threshold matter, we note that in its order affirming the Planning Commission, the circuit court did not reference LDR Article 3.1 by section in considering the issues raised by Appellants in their notice of appeal.  *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review."); *id.* ("Error preservation requirements are intended 'to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments.'" (quoting *I'On v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000))).  And Respondents correctly note Appellants declined to file a Rule 59(e), SCRCP, motion.

But our review of the record reveals (1) the circuit court's formal order addresses in detail the County's Comprehensive Plan, which Appellants challenged as violative of LDR Article 3.1's stated criteria; (2) the circuit court ruled on issues concerning LDR Article 11 (addressing cluster developments) as they relate to the density considerations of LDR Article 3.1; and (3) the circuit court's form 4 order referenced the entirety of the file as well as the parties' arguments, which addressed at length the Article 3.1 issues raised and argued.  Thus, we find the issues Appellants have raised as to LDR Article 3.1 and the County's Comprehensive Plan are preserved for our review.[7]  *See Royal v. Free Kindergarten Ass'n of Charleston*, 445 S.C. 436, 454, 914 S.E.2d 856, 865 (Ct. App. 2025) ("[W]here the question of [issue] preservation is subject to multiple interpretations, any doubt should be resolved in favor of preservation." (alterations in original) (quoting *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 333, 730 S.E.2d 282, 287 (2012) (Toal, C.J., concurring))).

LDR Article 3.1 provides:

### 3.1 Review Criteria

_____

[7] We further note section II, D of the circuit court's order specifically addresses traffic and access issues encompassed by LDR Article 3.1's review criteria.

Submitted subdivisions may be approved if they meet all of the following criteria:

- Adequate existing infrastructure and transportation systems exist to support the project;
- The project is compatible with the surrounding land use density;
- The project is compatible with the site's environmental conditions, such as but not limited to, wetlands, flooding, endangered species and/or habitat, and historic sites and/or cemeteries.

The first of the stated criteria to be considered is that "adequate existing infrastructure and transportation systems exist to support the project." *Id.* Under the preliminary plan, the proposed access point for The Stables lies on Meadow Brook Road. The South Carolina Department of Transportation (SCDOT) declined to comment on this access point based on its determination that Meadow Brook Road is a county road. Our review of the record reveals Meadow Brook Road is a dead-end road with ingress and egress only onto Old White Horse Road, a state road well-known for its high traffic volume.

Although a traffic impact study (TIS) is one way to support a finding satisfying this factor, LDR Article 9.1 states, "A TIS will be required for large developments such as major shopping centers, large planned developments, industrial complexes and any other projects that would generate 100 or more trips during the peak hour of the traffic generator or the peak hour of the adjacent street." Table 9.1 "gives examples of land use size thresholds that might be expected to generate 100 peak hour trips that may be used to determine whether a study will be required (based on [the] 7th edition of the *ITE Trip General Manual*)." For single family homes, the table indicates ninety units might be expected to generate 100 peak hour trips. Although there is nothing in Article 9 expressly granting the Planning Commission authority to order a TIS for a single-family home development with less than ninety units or to consider the combined effect of two subdivisions when evaluating the need for a TIS, there is also nothing in Article 9 stating the Planning Commission lacks authority to do so. For these reasons, we agree with Respondents that "whether to request a traffic impact study is at the very least discretionary."

Here, Appellants' traffic concerns are significant because we see nothing in this record to suggest that the existing transportation infrastructure will support The

Stables as proposed. Tumblin provided no testimony (or other evidence) that the *existing transportation infrastructure* will support The Stables. To the contrary, he indicated RP&L "will make improvements" to the road but did not specify what such improvements might entail other than "whatever the county asks us to do." Moreover, while staff recommended that the Planning Commission approve the preliminary subdivision application, the only reference to existing infrastructure and transportation is found in a section labeled "brief summary of request," which states, "Access is provided off of Meadow Brook Rd—a County Road."

The second criterion is "compatib[ility] with the surrounding land use density." The Old White Horse Road Corridor in the area where The Stables is proposed consists of rural agricultural and equestrian land. The immediate surrounding properties include Horney's thirty-one-acre acre horse farm to the north; Riverbend Equestrian Park, a sixty-three-acre equestrian facility, to the southeast; a fifty-eight-acre farm to the east; and other properties devoted primarily to agricultural or equestrian uses.

The Stables and surrounding areas along the Old White Horse Road Corridor are located in zone R-S, a zoning designation crafted to "provide reasonable safeguards for areas that are in the process of development with predominantly single-family dwellings but are generally still rural in character." Under Greenville County's Comprehensive Plan, the area for which The Stables is proposed is classified as "Suburban Edge," the classification for "low-density residential areas that offer opportunities for low-intensity development that is well-integrated with the natural landscape and agricultural uses." While the target density for such areas is "0 to 1 dwellings per acre," the developer intends for The Stables to consist of seventy-three homes situated on approximately nineteen acres (of the total forty-three-acre tract) with the remaining land proposed for use as open space and/or common areas. Most of the homes are proposed for lots of only 7800 square feet (0.174 acres), a density of over 5.5 homes per acre, as clustered.

At the Planning's Commission's meeting, Commissioner Clark commented, "Everything west of the Reedy along this corridor is very rural, large lots. This is not a compatible use along this corridor. And the fact that [The Stables] is sandwiched between 2 equestrian facilities I think is also not a good fit." And, as previously noted, a denser development that one commissioner referenced in favorable comparison to The Stables is actually located east of the Reedy River in zone R-15, a designation allowing for 2.9 units per acre for cluster developments (as compared to 1.7 units per acre for the correct zoning designation, R-S). Under the Comprehensive Plan, this other development is designated "Suburban

Neighborhood," which allows 3 to 5 dwellings per acre. This is a significant increase in density as compared to the "Suburban Edge" designation, which allows up to one dwelling per acre.

Other than the Planning Commission's vote approving this preliminary subdivision application, the only "evidence" in the record demonstrating The Stables "is compatible with the surrounding land use density" is the Planning Commission staff's recommendation, which states:

> The site is located within the Suburban Edge character area of the Comprehensive Plan. The recommended land use types for this area are low-density residential areas that offer opportunities for low-intensity development that is well integrated with the natural landscape and agricultural uses. Residential development may occur as Individual single-family structures on large lots, or clusters of homes designed to preserve large amounts of open space, which should be interconnected as part of the county's larger open space system. The recommended density is 0 to 1 dwellings per acre. The project proposes 1.69 units per acre consistent with the R-S zoning district.

Appellants persuasively argue that the evidence in the record does not support this recommendation.

The third, and final, consideration of LDR Article 3.1 is that "[t]he project is compatible with the site's environmental conditions, such as but not limited to, wetlands, flooding, endangered species and/or habitat, and historic sites and/or cemeteries." This is important because the record includes correspondence from opposing neighbor Woodard, the proprietor of Firstfruits Farm of South Carolina, LLC, indicating that The Stables is proposed for an area already prone to flooding.

By contrast, the Subdivision Advisory Committee found The Stables would be located in the Reedy River watershed. Yet Appellants assert that below the main waterflow area of The Stables is "the Branch," an approximately one-mile long blue-line stream that initiates from a pond on The Stables property and flows to the south. Appellants contend the Branch has experienced increased incidences of flooding affecting roads and other infrastructure at the location for which development of The Stables is proposed. According to Appellants, all water runoff

in this area flows into the Branch, and none of this flow reaches the Reedy River before reaching Richmond Hills, approximately two miles from the proposed location of The Stables.  Appellants maintain that during heavy rains, the Branch can flood, causing damage to the surrounding properties as reflected in photographs presented to the Planning Commission.  Tumblin responded to these flooding concerns by explaining that once the developers enter the design phase, they would "closely look at the existing pond to see if [there are] any issues."  He further noted the developers' plan is "to redirect all our new developed water to a new proposed [retention] pond," with the existing pond to "remain undisturbed."

We have been unable to find evidence in the record from which the Planning Commission could properly determine that this proposed development plan satisfies the LDR's environmental compatibility, infrastructure, and transportation criteria.  For these reasons and the other concerns noted above, we find the circuit court erred in upholding the Planning Commission's approval of the proposed development plan and preliminary subdivision application for The Stables.[8]

**Conclusion**

We reverse the circuit court's order upholding the Greenville County Planning Commission's approval of this preliminary subdivision application.

**REVERSED.**

**WILLIAMS, C.J., and TURNER, J., concur.**

---

[8] Because our findings here are dispositive, we decline to address Appellants' remaining issues on appeal.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not address remaining issues when resolution of another issue is dispositive).